# STATE OF CONNECTICUT *v.* SOLOMON BOYD
## (SC 17719)

Rogers, C. J., and Norcott, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued October 21, 2009—officially released April 27, 2010

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Raheem L. Mullins*, deputy assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's

attorney, and *Paul Ferencek*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROGERS, C. J. After a jury trial, the defendant, Solomon Boyd, was convicted of murder in violation of General Statutes § 53a-54a. The trial court rendered judgment in accordance with the verdict, and the defendant now appeals[1] from the judgment of conviction. The defendant claims that the trial court improperly: (1) denied his motion to suppress certain evidence on the ground that it was seized in violation of his rights under the fourth amendment to the United States constitution[2] and article first, § 7, of the Connecticut constitution;[3] (2) admitted evidence of uncharged misconduct; (3) admitted evidence that the defendant had invoked his right to remain silent in violation of his rights under the fifth amendment to the United States constitution;[4] and (4) failed to give a special credibility instruction on the testimony of an informing witness. We conclude that, although the defendant had a legitimate expectation of privacy in his cell phone, the automobile exception to the constitutional requirement for a search warrant applied under New York law. We also reject

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[3] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[4] The fifth amendment to the United States constitution provides in relevant part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

the defendant's other claims. Accordingly, we affirm the judgment of conviction.

The jury reasonably could have found the following facts. In 2001 and early 2002, the defendant lived in Mamaroneck, New York, with his girlfriend, Melissa Gagliardi. The defendant was a drug dealer. Carlos Barradas, the victim, spent a large amount of time at the defendant's apartment, where he helped the defendant with his drug business. In return, the defendant provided drugs to the victim. The victim also purchased drugs from the defendant on an almost daily basis.

In early January, 2002, a gold bracelet belonging to the defendant was missing from the apartment. The defendant believed that the victim had stolen the bracelet and became upset with him. On the night of January, 16, 2002, at approximately 10 p.m., the defendant told Gagliardi that he and the victim were going to go to Mount Vernon, New York, to buy drugs. The defendant and the victim took the victim's car. Instead of driving to Mount Vernon, however, they drove to Norwalk. They arrived at an area near the intersection of Merritt Street and Chestnut Street at approximately 11:48 p.m. The defendant then shot the victim with a .45 caliber semi-automatic gun. The victim exited from the car and tried to flee, but a fence blocked his way. The defendant, who also had exited the car, shot the victim again. The victim then entered and exited the car again in an attempt to escape from the defendant. The defendant ultimately shot the victim several times in front of the car, where the victim fell. Police arrived at the scene within minutes of the shooting and found the victim still alive. They took him to Norwalk Hospital where he was pronounced dead at 12:15 a.m.

Later that morning, when the defendant arrived back at his apartment in Mamaroneck, he was wearing a woman's sweatshirt. Gagliardi asked him where he had

acquired it, and the defendant told her that he had needed to change his clothes in order to get rid of " 'evidence' " or " 'gun's powder.' " At some point, Gagliardi asked the defendant where the victim was and the defendant told her that he had killed him by shooting him multiple times. He also indicated that his cousin, Kevin Thomas, had been present during the murder.

In March, 2004, the defendant was arrested and charged with murder. After a trial, the jury found him guilty of murder and the trial court rendered judgment in accordance with the verdict. This appeal followed.

I

We first address the defendant's claim that the trial court improperly denied his motion to suppress certain evidence that he claims was seized without a valid search warrant in violation of his rights under the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. We conclude that the evidence was admissible under the automobile exception to the constitutional requirement for a search warrant.

The following undisputed facts are relevant to this claim. In January and February, 2002, the Mamaroneck police department was investigating the defendant for suspected drug sales. On February 1, 2002, Joseph Comblo, a detective with the Mamaroneck police department, executed a search warrant in connection with the investigation. Both the warrant and the affidavit attached to the warrant were captioned: "FOR THE PREMISES AND PERSONS OF: SOLOMON BOYD, 627 MAMARONECK AVENUE, MAMARONECK, NEW YORK, APARTMENT # 3 . . . AND FOR THE PERSON OF SOLOMON BOYD AND ANY PERSON THEREIN." The body of the search warrant stated: "You are therefore commanded . . . to make an immediate search of 627 Mamaroneck Ave. . . . . Mamaroneck, New York

. . . for crack cocaine and cocaine, narcotics paraphernalia, including but not limited to plastic bags, records of ownership or use of this location, including trace evidence, records of narcotics transactions, any safe and its contents, computers, computer programs, computer data, and [United States] [c]urrency used to purchase crack cocaine and cocaine . . . ."

Because the Mamaroneck police were aware that the Norwalk police department was investigating the defendant in connection with the victim's murder, Robert Holland, a sergeant with the Mamaroneck police department, invited Arthur Weisgerber and Charles Chrzanowski, detectives with the Norwalk police department, to accompany the Mamaroneck police during the search of the defendant's apartment. The Mamaroneck police department executed the warrant at approximately 7:45 p.m. on February 8, 2002. Weisgerber and Chrzanowski arrived at the apartment after the search had begun. They did not participate in the search, but remained in the kitchen of the apartment.[5] They attended the search in the hope that, while the Mamaroneck police were searching for drugs, they would find in plain view evidence related to the victim's murder, such as a gun, ammunition or bloody clothes. The Mamaroneck police found crack cocaine, drug paraphernalia, a scale, a razor blade and a computer in the apartment. Gagliardi was present during the search and the police arrested her on drug charges. The police found no evidence related to the murder.

During the search, Holland received a radio call that other Mamaroneck police officers had stopped the defendant nearby as he was returning to the apartment

---

[5] Weisgerber testified that he and Chrzanowski were in the kitchen of the apartment while the Mamaroneck police conducted the search. Although Holland testified that Weisgerber and Chrzanowski remained outside the apartment, we assume for purposes of this opinion that they were inside the apartment during part of the search.

in his car. Holland and Weisgerber went to the location where the defendant had been stopped. By the time they arrived, the other police officers already had arrested the defendant for drug offenses on the basis of the evidence seized at the apartment. Holland and Weisgerber noticed a cell phone on the passenger seat of the car that the defendant had been driving.

Later that night, Weisgerber and Chrzanowski went to the Mamaroneck police station to interview Gagliardi about the murder. While they were waiting to interview Gagliardi, Andy Genovese, a detective with the Mamaroneck police department, was at his desk nearby, scrolling through the numbers on the cell phone that had been taken from the defendant's car.[6] Genovese announced several telephone numbers that he had found on the cell phone, including the cell phone's subscriber number. Chrzanowski recorded the number in his notes.

Thereafter, Weisgerber prepared and executed a search warrant on Sprint Spectrum L.P., the wireless telecommunications company that serviced the cell phone for the telephone records related to the cell phone. The cell phone records revealed that the account for the cell phone was in the defendant's name. The records also showed that, in the hour before the victim's murder, calls from and to the cell phone had been routed through a series of telecommunications towers progressing in a northeasterly direction from Mamaroneck to Norwalk. A number of cell phone calls that had been made and received minutes before the murder had been routed through a tower located approximately five blocks north of the murder scene. The cell phone records further showed that, beginning minutes after the murder, a number of calls from and to the cell phone

---

[6] The record is unclear as to when the cell phone had been seized from the car and who had seized it. Weisgerber testified, however, that he believed that the cell phone was still on the front seat of the vehicle when it was brought to the Mamaroneck police station.

had been routed through a series of towers progressing in a southwesterly direction from Norwalk to Mamaroneck.

In addition, the cell phone records revealed that, shortly after the murder, several calls originating with the cell phone had been made to the telephone of Sally Williams, who is Gagliardi's mother. Gagliardi's cousin, Joanne Gentile, who was one of the defendant's drug customers, was living with Williams at that time. Gentile testified at trial that the defendant had called her in a panicked state on the night of the murder and had asked her to go to his apartment to tell Gagliardi to call him or to answer his telephone calls. Gagliardi testified that, after Gentile came to the apartment, she answered the telephone and the defendant asked her to call his sister to ask her to provide him with an alibi. The defendant also asked Gagliardi to say that he had been at his sister's house getting his hair done or that he had been at home with Gagliardi. Gagliardi refused and hung up the telephone.

Before trial, the defendant filed a motion to suppress the cell phone records and any other evidence to which the police had been led as the result of seizing the cell phone. At the suppression hearing, Holland testified that, although the warrant did not specifically authorize the police to seize cell phones, the Mamaroneck police department considered cell phones to constitute drug paraphernalia and records, which were covered by the warrant. Gagliardi testified that, when the Norwalk police interviewed her on the night of the search, she knew the defendant's cell phone number and that the carrier for the cell phone was "Sprint." The defendant testified about the circumstances surrounding certain statements that he had made after his arrest for murder, but he did not testify regarding the cell phone.

The defendant argued at the suppression hearing that the cell phone was not covered by the search warrant

because the warrant authorized a search only of the defendant's apartment, not his person. He further argued that the seizure of the cell phone was not valid under any of the exceptions to the fourth amendment warrant requirement. The state argued that, because the search warrant referred to the defendant's person, it was not limited to his apartment. It further argued that, even if the search warrant did not authorize the seizure and search of the cell phone, the search was valid under the automobile exception to the constitutional requirement for a warrant, the search incident to lawful arrest exception, the doctrine of exigent circumstances and the inevitable discovery doctrine.

The trial court concluded that the search warrant had authorized the seizure and search of the cell phone because it authorized the search of the defendant for evidence of drug activity and the evidence presented at the suppression hearing showed that the Mamaroneck police had seized the cell phone on the basis of their experience that cell phones contain such information. The trial court further concluded that, even if the search warrant had not authorized the seizure and search of the cell phone, the inevitable discovery doctrine applied because Weisgerber and Chrzanowski would have learned the cell phone number from Gagliardi when they interviewed her on the night of the search if Genovese had not revealed the number to them. Accordingly, the trial court denied the defendant's motion to suppress all evidence developed as the result of the seizure of the cell phone.

The defendant now claims that the trial court improperly determined that the search warrant authorized the seizure and search of the cell phone and that, even if the warrant did not authorize the search, the inevitable discovery doctrine applied. The state disputes these claims and claims as alternate grounds for affirmance that the defendant had no reasonable expectation of

privacy in his cell phone number and that the search was valid under both the automobile exception and the search incident to arrest exception. Finally, the state claims that, even if the search was unconstitutional, the admission of the evidence related to the cell phone was harmless. We conclude that the defendant had a reasonable expectation of privacy in the contents of his cell phone, but that the search of the cell phone was valid under the automobile exception. Accordingly, we need not address the defendant's claims that the trial court improperly concluded that the search warrant authorized the search of the cell phone and that the inevitable discovery doctrine applied.

We begin with the standard of review for a motion to suppress. "It is axiomatic that [u]nder the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality." (Internal quotation marks omitted.) *State* v. *Santos*, 267 Conn. 495, 511, 838 A.2d 981 (2004). "As a general matter, the standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence. . . . [W]here the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 362–63, 952 A.2d 784 (2008).

## A

We first consider the state's claim that the trial court's denial of the defendant's motion to suppress may be affirmed on the alternate ground that the defendant had no reasonable expectation of privacy in the contents of his cell phone under the fourth amendment.[7] We disagree.

"The touchstone to determining whether a person has standing to contest an allegedly illegal search is whether that person has a reasonable expectation of privacy in the invaded place. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . In order to meet this rule of standing . . . a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . Whether a defendant's actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 92, 675 A.2d 866 (1996). "The burden of proving the existence of a reasonable expectation of privacy rests on the defendant." *State* v. *Gonzalez*, 278 Conn. 341, 349, 898 A.2d 149 (2006).

"The courts have identified a number of factors indicating that a person's expectation of privacy in a particular place is one that society is not prepared to recognize as reasonable." *State* v. *Mooney*, 218 Conn.

---

[7] The trial court did not rule explicitly on the question of whether the defendant had a reasonable expectation of privacy in his cell phone or its contents, but implicitly concluded that he did when the court concluded that the cell phone was covered by the search warrant.

85, 96, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). "[A]n individual . . . may have a constitutionally cognizable expectation of privacy in areas where his use is exclusive, that is, where he has the legal right to control access and to exclude others." (Internal quotation marks omitted.) *State* v. *Sealy*, 208 Conn. 689, 693, 546 A.2d 271 (1988).

"[A]lthough the inquiry in determining whether there is a reasonable expectation of privacy involves an inquiry into the particular place invaded, when the search is of a [container] the principal 'place' for fourth amendment purposes is the interior of the [container] and its contents." *State* v. *Mooney*, supra, 218 Conn. 103–104. "[I]t is the contents . . . of . . . closed containers in which a reasonable expectation of privacy may inhere, not the visible exterior or location of the containers." Id., 102. Thus, in determining whether the defendant has a reasonable expectation of privacy in his cell phone, we focus on the contents of the cell phone, not on the cell phone itself or its visible exterior.

The state argues that the defendant failed to establish that he had a reasonable expectation of privacy in the contents of his cell phone because he presented no evidence that he owned it. The state further argues that, even if the defendant owned the cell phone, mere ownership or possession is not sufficient to establish a reasonable expectation of privacy; see *United States* v. *Salvucci*, 448 U.S. 83, 92, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980) (mere possessory interest in seized item is not sufficient to establish fourth amendment interest); and he presented no evidence that he had taken steps to keep his cell phone number private. The defendant counters that he was not required to present evidence at the suppression hearing that the cell phone belonged to him because, even without such evidence, the record established that he owned the cell phone and had exhibited an expectation of privacy in its con-

tents. See *State* v. *Rodriguez*, 223 Conn. 127, 133–34, 613 A.2d 211 (1992) (finding reasonable expectation of privacy on basis of information presented in search warrant affidavit and statements that defendant made to police before search warrant was issued). He further contends that his expectation of privacy was reasonable. We agree with the defendant.

The evidence presented at the suppression hearing established that the police seized the cell phone from the passenger seat of the car that the defendant had been driving. Gagliardi testified that the defendant possessed a cell phone at the time of the search. In addition, the cell phone records themselves indicated that the cell phone belonged to the defendant. Finally, the defendant's exclusive possession is implicit in the state's claim that the cell phone records showed that the defendant had traveled to Norwalk on the night of the murder and that the defendant had been in possession of the cell phone that night.[8] Accordingly, we conclude that

---

[8] The United States Supreme Court has held that the fact that a defendant had a possessory interest in an item that was sufficient to prove a possessory offense is not necessarily sufficient to establish that the defendant had a reasonable expectation of privacy in the item. See *United States* v. *Salvucci*, supra, 448 U.S. 90 (rejecting "unexamined assumption that a defendant's possession of a seized good sufficient to establish criminal culpability was also sufficient to establish [f]ourth [a]mendment 'standing' "). Similarly, in the present case, if the state had merely alleged that the defendant was in possession of the cell phone on the night of the murder, that allegation would not necessarily be sufficient to establish that the defendant had a reasonable expectation of privacy in the cell phone. The state's claim that the cell phone was in the defendant's possession that night, however, was premised on undisputed evidence that tended to show that the defendant owned the cell phone and used it exclusively. We do not think that the state should be able to claim simultaneously that: (1) the cell phone records proved that the defendant traveled to Norwalk on the night of the murder because it was undisputed that the defendant owned and exclusively used the cell phone; and (2) the defendant has not proved that he owned or exercised control over the cell phone. Cf. id. (" 'vice' of prosecutorial contradiction" is not implicated when proof of government's case does not constitute proof of defendant's reasonable expectation of privacy).

the trial court reasonably could have concluded that the defendant owned the cell phone and exercised exclusive control over it, and that he therefore had a reasonable expectation that others would not have access to it without his permission. We conclude, therefore, that he had a reasonable expectation of privacy in the cell phone. Cf. *State* v. *Sealy,* supra, 208 Conn. 693 (reasonable expectation of privacy exists when person has exclusive use of area, right to control access and right to exclude others); see *United States* v. *Finley,* 477 F.3d 250, 259 (5th Cir.) (defendant had reasonable expectation of privacy in cell phone because he had possessory interest in it, had right to exclude others and exhibited subjective expectation of privacy by taking normal precautions to maintain privacy, such as keeping cell phone on his person), cert. denied, 549 U.S. 1353, 127 S. Ct. 2065, 167 L. Ed. 2d 790 (2007).[9]

[9] See also *United States* v. *Zavala,* 541 F.3d 562, 577 (5th Cir. 2008) (individual has reasonable expectation of privacy in information contained in cell phone); *United States* v. *Quintana,* 594 F. Sup. 2d 1291, 1299 (M.D. Fla. 2008) ("[a]n owner of a cell phone generally has a reasonable expectation of privacy in the electronic data stored on the phone"); *United States* v. *James,* United States District Court, Docket No. 1:06CR134 CDP, 2008 U.S. Dist. LEXIS 34864, *10 (E.D. Mo. April 29, 2008) ("it is reasonable for a person to expect the information contained in a cell phone—especially information such as that contained in the address book, which is not available even to the service provider—will be free from intrusion from both the government and the general public" [internal quotation marks omitted]); *United States* v. *Morales-Ortiz,* 376 F. Sup. 2d 1131, 1139 (D.N.M. 2004) (individual has "an expectation of privacy in an electronic repository for personal data, including cell telephones and pager data memories"); see also *United States* v. *Murphy,* 552 F.3d 405, 410–11 (4th Cir.) (assuming without analysis that defendant had reasonable expectation of privacy in contents of cell phone), cert. denied, 556 U.S. 1196, 129 S. Ct. 2016, 173 L. Ed. 2d 1109 (2009); *United States* v. *Urbina,* United States District Court, Docket No. 06-CR-336, 2007 U.S. Dist. LEXIS 96345, *37–38 (E.D. Wis. November 6, 2007) (same); *United States* v. *Park,* United States District Court, Docket No. CR 05-375 SI, 2007 WL 1521573, *5 and n.3 (N.D. Cal. May 23, 2007) (same); *United States* v. *Young,* United States District Court, Docket No. 5:05CR63-01-02 (N.D. W. Va. May 9, 2006) (same); *United States* v. *Cote,* United States District Court, Docket No. 03CR271, 2005 WL 1323343, *6 (N.D. Ill. May 26, 2005) (same); but see *United States* v. *Mercado-Nava,* 486 F. Sup. 2d 1271, 1276 (D. Kan. 2007) (when cell phones were taken from

The state also claims, however, that even if the defendant owned and controlled the cell phone, he failed to establish that he had a reasonable expectation of privacy in the cell phone number because he presented no evidence that he had made any attempt to keep it private. In support of this claim, the state relies on *United States* v. *Fierros-Alavarez*, 547 F. Sup. 2d 1206 (D. Kan. 2008). In that case, the court concluded that, because the defendant had lawful possession and control of his cell phone when it was seized and searched by the police, he had a subjective expectation of privacy in it. Id., 1210. The court also concluded, however, that the defendant had no reasonable expectation of privacy in the cell phone's recent call directory showing the numbers that the defendant had called from the cell phone because he had provided that information to third parties. Id., 1210–11. In support of this conclusion, the court relied on *Smith* v. *Maryland,* 442 U.S. 735, 742–44, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979) (no reasonable expectation of privacy in dialed telephone number because telephone company must receive telephone number to complete call and person has no legitimate expectation of privacy in information he voluntarily turns over to third parties), and *United States* v. *Forrester,* 512 F.3d 500, 509–10 (9th Cir. 2008) (applying *Smith* to validate police surveillance of defendant's computer to obtain e-mail addresses of outgoing e-mails and addresses of web sites visited).

We do not find the court's reasoning in *Fierros-Alavarez* to be persuasive. In *Smith* and *Forrester,* the government had not obtained the dialed telephone numbers and e-mail addresses from an item or area in which

defendant's person but defendant did not assert ownership of cell phones, did not testify as to expectation of privacy in cell phones and did not present testimony that he had legitimate possessory interest in cell phones or had taken steps to insure his privacy in them, defendant had no reasonable expectation of privacy in content of cell phones).

the defendant had a reasonable expectation of privacy, but had obtained the information from, respectively, the telephone company and the Internet provider. See *Smith* v. *Maryland*, supra, 442 U.S. 741 (government installed pen register to record numbers dialed from defendant's telephone on telephone company property at telephone company's central offices); *United States* v. *Forrester*, supra, 512 F.3d 505 (government installed "pen register analogue" at Internet provider's facility).[10] Thus, we understand the cases to stand for the proposition that the government can obtain information that the defendant has provided to a third party *from that third party* without implicating the defendant's fourth amendment rights. For example, in the present case, if the police had obtained the defendant's cell phone number from Gagliardi or from the cell phone carrier, there would have been no fourth amendment violation under *Smith* and *Forrester* because the defendant could have no reasonable expectation that Gagliardi and the carrier would not reveal the information. Contrary to the court's assumption in *Fierros-Alavarez*, however, nothing in either case supports a conclusion that, if a defendant has a reasonable expectation of privacy in an area or item, the government may search that area or item for any information that the defendant had provided to third parties without triggering fourth amendment protections. We conclude, therefore, that the fact that the defendant in the present case had provided his cell phone number to third parties and had not taken steps to ensure that it was confidential does not mean that he had no reasonable expectation that the police would not search the contents of his cell phone for the number without a warrant. We conclude,

---

[10] See also *Quon* v. *Arch Wireless Operating Co.*, 529 F.3d 892, 905 (9th Cir. 2008) (individual has reasonable expectation of privacy in content of text messages obtained from cell phone service provider, but not in addresses), cert. denied sub nom. *USA Mobility Wireless, Inc.* v. *Quon*, 558 U.S. 1091, 130 S. Ct. 1011, 175 L. Ed. 2d 618 (2009).

therefore, that the defendant had a reasonable expectation of privacy in all of the contents of his cell phone, including his subscriber number.

B

We next address the state's alternate ground for affirmance that the seizure of the cell phone and the search of its contents were valid under the automobile exception to the warrant requirement under the fourth amendment to the United States constitution. The state contends that, although the search would have been unconstitutional under article first, § 7, of the Connecticut constitution if conducted in Connecticut by Connecticut police; see *State* v. *Miller*, 227 Conn. 363, 386–87, 630 A.2d 1315 (1993) ("a warrantless automobile search supported by probable cause, but conducted after the automobile has been impounded at the police station, violates article first, § 7, of the Connecticut constitution"); this rule of state constitutional law does not apply to the search because the New York police officers conducted the search in accordance with New York law. See *People* v. *Blasich*, 73 N.Y.2d 673, 681, 541 N.E.2d 40, 543 N.Y.S.2d 40 (1989) (automobile exception "is equally applicable whether the search is conducted at the time and place where the automobile was stopped or whether, instead, the vehicle is impounded and searched after removal to the police station"). We agree with the state.

At the outset, we address the defendant's contention that the record is not adequate for review of the state's claimed alternate ground for affirmance because the trial court did not make factual findings regarding the applicability of the automobile exception. We disagree. The trial court found that the cell phone was on the front passenger seat of the defendant's car when he was arrested. The court also expressly found that it was not clear when the cell phone had been seized from

the car on the basis of the evidence presented at the suppression hearing, but that the cell phone was in the possession of the Mamaroneck police when they returned to the police station. Finally, the trial court found that "the Norwalk police were not implicated in the determination of the [cell phone] number; it was solely the Mamaroneck police who did so." As we discuss subsequently in this opinion, we conclude that these factual findings are sufficient for this court to determine whether the state met its burden of proving the automobile exception to the warrant requirement.

Accordingly, we turn to a review of the law governing the automobile exception to the constitutional requirement for a warrant. "Under both the federal and the state constitutions, the police must first obtain a warrant before conducting a search, unless an exception to the warrant requirement applies." (Internal quotation marks omitted.) *State* v. *Smith,* 257 Conn. 216, 228, 777 A.2d 182 (2001). "[T]he burden is on the state to prove the existence of an exception to the warrant requirement." *State* v. *Joyce,* 229 Conn. 10, 27 n.19, 639 A.2d 1007 (1994), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

"In *Carroll* v. *United States,* 267 U.S. 132, 153, 45 S. Ct. 280, 69 L. Ed. 543 (1925), the United States Supreme Court held that the fourth amendment is not violated by a roadside warrantless search of an automobile if the police have probable cause to search the automobile and if obtaining a warrant would be impracticable because of the possibility that the automobile will be moved out of the jurisdiction. The rule announced in *Carroll* has come to be called the automobile exception to the warrant requirement. Connecticut recognizes this exception as a matter of state constitutional law." *State* v. *Miller,* supra, 227 Conn. 378.

In *Miller*, this court rejected what it characterized as a request to expand the automobile exception to permit "a warrantless automobile search that is conducted after the automobile has been impounded at a police station."[11] Id., 383. The court reasoned that, because the exception is justified only by "the inherent mobility of automobiles and the latent exigency that that mobility creates"; id., 384–85; and because those circumstances no longer exist after the automobile has been impounded, "a warrantless automobile search supported by probable cause, but conducted after the automobile has been impounded at the police station, violates article first, § 7, of the Connecticut constitution." Id., 386–87.

In the present case, the state does not dispute that, if Connecticut police had seized and searched the defendant's cell phone in this state, the search would have been unconstitutional under *Miller* and, therefore, the evidence would have been inadmissible. Thus, the state implicitly concedes that the evidence would not support a finding that the police seized the cell phone when they arrested the defendant, and that it must therefore be presumed that they seized the cell phone from the defendant's car after it was impounded at the police station. The state argues, however, that, because the evidence was obtained in New York by New York police officers in compliance with New York law, the exclusionary rule does not bar its admission merely because the search would have violated this state's constitutional law if it had occurred in this state. We agree with the state that: (1) the legality of the search was governed by New York law; and (2) under New York law, the search was legal.

---

[11] Before this court's decision in *Miller*, the United States Supreme Court had concluded in *Chambers* v. *Maroney*, 399 U.S. 42, 51–52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), that the fourth amendment permits a warrantless automobile search supported by probable cause and conducted while the automobile was impounded at a police station.

We first consider whether the legality of the search should be determined under Connecticut law or New York law. The majority of courts that have considered the issue have concluded that "it does not offend the constitutional principles of a forum jurisdiction to allow the transfer of criminal evidence from the officers of another jurisdiction to those of the forum when the evidence has been obtained lawfully by the former without any assistance by the latter," even when the search would have been illegal in the forum jurisdiction.[12] *State*

---

[12] See *D'Antorio* v. *State*, 926 P.2d 1158, 1161 n.4 (Alaska 1996) (law of state where search occurred governs validity); *Echols* v. *State*, 484 So. 2d 568, 571–72 (Fla. 1985) (evidence lawfully obtained by Indiana police was admissible in Florida even though search would have been illegal under Florida law), cert. denied, 479 U.S. 871, 107 S. Ct. 241, 93 L. Ed. 2d 166 (1986); *People* v. *Barrow*, 133 Ill. 2d 226, 257–58, 549 N.E.2d 240 (1989) (evidence lawfully obtained in Maryland was admissible in Illinois even though means by which evidence was obtained would have been illegal in Illinois), cert. denied, 497 U.S. 1011, 110 S. Ct. 3257, 111 L. Ed. 2d 767 (1990); *State* v. *Cooper*, 223 Kan. 175, 177, 573 P.2d 1006 (1977) (law of state where search occurred governs validity); *Helm* v. *Commonwealth*, 813 S.W.2d 816, 818–20 (Ky. 1991) (state constitutional law governing searches has no extraterritorial effect and evidence lawfully obtained by Ohio police was admissible in Kentucky); *Frick* v. *State*, 634 P.2d 738, 740 (Okla. 1981) (evidence that was legally obtained in Virginia was admissible in Oklahoma even though search would have been illegal under Oklahoma law); *Commonwealth* v. *Sanchez*, 552 Pa. 570, 575–78, 716 A.2d 1221 (1998) (evidence that was legally obtained in California was admissible in Pennsylvania even though search would have been illegal under Pennsylvania law); *State* v. *Cauley*, 863 S.W.2d 411, 416 (Tenn. 1993) (law of jurisdiction where evidence was obtained governs validity of search); *State* v. *Coburn*, 165 Vt. 318, 324–25, 683 A.2d 1343 (1996) (Vermont constitution did not apply to evidence legally seized by federal customs officials); *State* v. *Brown*, 132 Wash. 2d 529, 590, 940 P.2d 546 (1997) (evidence that was lawfully obtained in California was admissible in Washington even though police conduct might have been illegal in Washington), cert. denied, 523 U.S. 1007, 118 S. Ct. 1192, 140 L. Ed. 2d 322 (1998); see also *People* v. *Orlosky*, 40 Cal. App. 3d 935, 939, 115 Cal. Rptr. 598 (1974) (evidence obtained in search that was illegal under Indiana law was admissible in California, where search would have been legal); *People* v. *Saiken*, 49 Ill. 2d 504, 508–12, 275 N.E.2d 381 (1971) (evidence obtained in search that was illegal under Indiana law was admissible in Illinois because search was legal under fourth amendment), cert. denied, 405 U.S. 1066, 92 S. Ct. 1499, 31 L. Ed. 2d 796 (1972); *State* v. *Rivers*, 420 So. 2d 1128, 1132 (La. 1982) (Louisiana law did not apply to search conducted

v. *Mollica*, 114 N.J. 329, 353, 554 A.2d 1315 (1989). A number of these courts have reasoned that, because the primary justification for the exclusionary rule is to deter illegal police conduct, no valid purpose is served by excluding evidence that has been obtained legally. See id., 353–54; *Echols* v. *State*, 484 So. 2d 568, 572 (Fla. 1985) ("[a]ny rule of evidence that denies the jury access to clearly probative and reliable evidence must bear a heavy burden of justification, and must be carefully limited to the circumstances in which it will pay its way by deterring official [lawlessness]" [internal quotation marks omitted]), cert. denied, 479 U.S. 871, 107 S. Ct. 241, 93 L. Ed. 2d 166 (1986); *State* v. *Lucas*, 372 N.W.2d 731, 737 (Minn. 1985) (exclusion of legally obtained tapes not justified because it would not serve to deter illegal conduct by police officers in either forum state or state where search was conducted); *State* v. *Evers*, 175 N.J. 355, 380, 815 A.2d 432 (2003) (exclusion of legally obtained evidence not justified because it

in Alabama; dispositive inquiry was whether search was valid under fourth amendment); *State* v. *Lucas*, 372 N.W.2d 731, 736 (Minn. 1985) ("[t]here is . . . no requirement that evidence obtained in another state be excluded in [forum] state merely because it would be inadmissible if the prosecution were in that other state"); *State* v. *Evers*, 175 N.J. 355, 379, 815 A.2d 432 (2003) (same); *Burge* v. *State*, 443 S.W.2d 720, 723 (Tex. Crim. App.) (when evidence was obtained illegally in Oklahoma but search would have been legal in Texas, evidence was admissible because evidentiary rules of forum state apply), cert. denied, 396 U.S. 934, 90 S. Ct. 277, 24 L. Ed. 2d 233 (1969); but see *Stidham* v. *State*, 608 N.E.2d 699, 701 (Ind. 1993) (when confession was obtained legally in Illinois, but would have been illegal in Indiana, it was inadmissible in Indiana); *State* v. *Lynch*, 292 Mont. 144, 149, 969 P.2d 920 (1998) (when evidence was obtained legally in Nevada, but search would have been illegal in Montana, evidence was inadmissible in Montana because exclusionary rule is rule of evidence and evidentiary rules of forum state apply); *People* v. *Griminger*, 71 N.Y.2d 635, 641, 524 N.E.2d 409, 529 N.Y.S.2d 55 (1988) ("[s]ince [the] defendant has been tried for crimes defined by the [s]tate's [p]enal [l]aw, we can discern no reason why he should not also be afforded the benefit of our [s]tate's search and seizure protections"); *State* v. *Davis*, 313 Or. 246, 253–54, 834 P.2d 1008 (1992) (Oregon's constitutional law applies to all evidence presented in Oregon courts, regardless of whether search was legal under law of jurisdiction where obtained).

"would advance none of its purposes—deterrence, judicial integrity, and imposing a cost on illicit behavior"); see also *State* v. *Cauley*, 863 S.W.2d 411, 415–16 (Tenn. 1993) (relying on *Mollica*). The courts have reasoned that, under these circumstances, the sole "effect of suppression would [be] to keep highly probative and lawfully obtained evidence from the jury." (Internal quotation marks omitted.) *Commonwealth* v. *Sanchez*, 552 Pa. 570, 578, 716 A.2d 1221 (1998); see also *State* v. *Evers*, supra, 380 (exclusion of legally obtained evidence "would disserve the process of doing justice in this state by preventing the introduction of reliable and relevant evidence").

Like these courts, this court previously has recognized that "[t]he purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim . . . . Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the [f]ourth [a]mendment against unreasonable searches and seizures . . . . Application of the rule is thus appropriate in circumstances in which this purpose is likely to be furthered." (Internal quotation marks omitted.) *Payne* v. *Robinson*, 207 Conn. 565, 570, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988). Moreover, we agree with these courts that the application of the exclusionary rule to evidence that was obtained legally by officers of another jurisdiction will not deter unlawful police conduct either in this state or in the other jurisdictions. Accordingly, we decline the defendant's invitation in the present case to expand the exclusionary rule to apply to such evidence.

The defendant contends, however, that even if the exclusionary rule ordinarily does not apply to evidence that was lawfully obtained in another jurisdiction when the official conduct at issue would have been illegal in this state, the exclusionary rule does apply when the

officers from the other jurisdiction acted as agents for officers of this state. In support of this contention, the defendant relies on *Lustig* v. *United States*, 338 U.S. 74, 78–80, 69 S. Ct. 1372, 93 L. Ed. 1819 (1949) (federal officer's participation in illegal search conducted by state officials rendered evidence inadmissible in federal criminal proceeding), *Gambino* v. *United States*, 275 U.S. 310, 316–17, 48 S. Ct. 137, 72 L. Ed. 293 (1927) (when unconstitutional search and seizure was made solely for purpose of aiding United States in enforcement of its laws, evidence was inadmissible in federal criminal proceeding even though state officers were not acting under direction of federal officials), and *Byars* v. *United States*, 273 U.S. 28, 33, 47 S. Ct. 248, 71 L. Ed. 520 (1927) (when federal officer participated in illegal search conducted by state police, "effect is the same as though he had engaged in the undertaking as one exclusively his own").[13] The defendant contends that these cases support the general proposition that, when evidence was obtained in a search that was legal in the search jurisdiction but that would have been illegal in the forum jurisdiction, the evidence is inadmissible in

---

[13] *Lustig, Gambino* and *Byars* involved the so-called " 'silver platter' " doctrine. See *United States* v. *Janis*, 428 U.S. 433, 444, 96 S. Ct. 3021, 49 L. Ed. 2d 1046 (1976). Under that doctrine, because "the [f]ourth [a]mendment [originally] did not apply to state officers . . . material seized unconstitutionally by a state officer could be admitted in a federal criminal proceeding." Id. In *Elkins* v. *United States*, 364 U.S. 206, 223, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960), the United States Supreme Court overruled the silver platter doctrine and held that "evidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the [f]ourth [a]mendment is inadmissible over the defendant's timely objection in a federal criminal trial." In *Mapp* v. *Ohio*, 367 U.S. 643, 655, 660, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), the United States Supreme Court held that, because the fourth amendment had been held applicable to the states through the fourteenth amendment, evidence seized by state officials in violation of the fourth amendment was inadmissible in state criminal proceedings. Nevertheless, the principles underlying the doctrine continue to provide guidance on the application of the exclusionary rule to evidence obtained outside the forum court's jurisdiction.

the forum jurisdiction if officers from the forum juris-
diction participated in the search.[14]

We need not decide in the present case, however,
whether participation by officials of this state in a
search that is legal in the search jurisdiction, but which
would be illegal in this state, renders the evidence inad-
missible in this state and, if so, what level of participa-
tion by this state's officials is required, because, upon
a careful review of the record, we conclude that the
trial court's finding that "the Norwalk police were not
implicated in the determination of the cell phone num-
ber; it was solely the Mamaroneck police who did so,"
was supported by substantial evidence. The evidence
shows that Norwalk police were not present while the
Mamaroneck police engaged in conduct that the defen-
dant claims would have been unconstitutional if con-
ducted by Connecticut officials, namely, the seizure of

[14] A number of state courts have reached this conclusion. See *State* v.
*Cauley*, supra, 863 S.W.2d 416 ("[w]hen evidence is used in a Tennessee
courtroom that has been obtained at the behest of Tennessee authorities
pursuant to their own investigation of a crime occurring within our borders,
as in the instant case, Tennessee's constitutional search and seizure princi-
ples should apply"); *State* v. *Brown*, 132 Wash. 2d 529, 588, 940 P.2d 546
(1997) (whether statements legally obtained in California could be admitted
under Washington law depended on whether California police had acted as
agents of Washington police), cert. denied, 523 U.S. 1007, 118 S. Ct. 1192,
140 L. Ed. 2d 322 (1998). Other authorities have concluded, however, that,
when the seizure of evidence was "valid under the law of the search jurisdic-
tion but would be regarded as unlawful had it occurred in the forum . . . the
evidence should be admitted even if police agents of the forum participated in
the extrajurisdictional search." R. Tullis & L. Ludlow, "Admissibility of
Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary
Rule," 10 U.S.F. L. Rev. 67, 91 (1975); see also *Echols* v. *State*, supra, 484
So. 2d 571–72; *State* v. *Lucas*, supra, 372 N.W.2d 737. Presumably, the ratio-
nale for this conclusion is that it would be unrealistic and counterproductive
to require government officials of the search jurisdiction to comply with
the law of the forum state. See, e.g., *Echols* v. *State*, supra, 571–72 ("we do
not believe that the interest of Florida is served by imperially attempting
to require that out-of-state police officials follow Florida law, and not the
law of the situs, when they are requested to cooperate with Florida officials
in investigating crimes committed in Florida").

the defendant's cell phone after his automobile was impounded. Moreover, there was no evidence that the Norwalk police had any knowledge that the Mamaroneck police intended to engage in such conduct or that they had influenced the Mamaroneck police in any way.[15] In addition, although the Norwalk police were present in the police station when Genovese searched the contents of the cell phone and announced the cell phone number, they were there to interview Gagliardi, not to obtain information about the search from the Mamaroneck police. Indeed, there was no evidence that the Norwalk police knew that the Mamaroneck police had seized the cell phone, that they would search its contents or that they would announce their findings. We conclude, therefore, that there was no evidence to support a conclusion that the Norwalk police had intended to violate the state constitution by "circuitous and indirect methods." *Byars* v. *United States*, supra, 273 U.S. 32. Because it is clear that, under any standard, the Mamaroneck police were not acting as agents for the Norwalk police, the legality of the search must be determined under New York law.

We turn, therefore, to that question. Under New York constitutional law, "when the occupant of an automobile is arrested, the very circumstances that supply probable cause for the arrest may also give the police probable cause to believe that the vehicle contains contraband, evidence of the crime, a weapon or some means of escape. If so, a warrantless search of the vehicle is authorized . . . as a search falling within the automobile exception to the warrant requirement . . . ." *People* v. *Blasich,* supra, 73 N.Y.2d 678; see also *People* v. *Belton,* 55 N.Y.2d 49, 54–55, 432 N.E.2d 745, 447 N.Y.S.2d 873 (1982) (under automobile exception,

---

[15] Indeed, if the Norwalk police had intended to obtain the cell phone, they could have asked the Mamaroneck police to seize it from the defendant's automobile when he was arrested.

"a valid arrest for a crime authorizes a warrantless search—for a reasonable time and to a reasonable extent—of a vehicle and of a closed container visible in the passenger compartment of the vehicle which the arrested person is driving or in which he is a passenger when the circumstances give reason to believe that the vehicle or its visible contents may be related to the crime for which the arrest is being made [as possibly containing contraband or as having been used in the commission of the crime]").[16] When the automobile exception applies, police also may search closed containers located within the automobile that may contain evidence of the crime of arrest. See *People* v. *Belton*, supra, 54–55; *People* v. *Langen*, 60 N.Y.2d 170, 172, 456 N.E.2d 1167, 469 N.Y.S.2d 44 (1983) ("when the circumstances giving rise to probable cause to arrest a driver or passenger in the automobile also support the belief

---

[16] Under federal constitutional law, when an occupant has been arrested and there is reason to believe that the automobile contains evidence related to the offense of arrest, a search of the automobile is valid under the search incident to arrest exception. See *Arizona* v. *Gant*, 556 U.S. 332, 343–44, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (under search incident to arrest exception, when there is "reasonable basis to believe the vehicle contains relevant evidence . . . the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein" [citations omitted]). The New York Court of Appeals has held that, under that state's constitution, the search incident to arrest exception "exists only to protect against the danger that an arrestee may gain access to a weapon or may be able to destroy or conceal critical evidence. Thus, we have held that the scope of such a search must be limited to the arrestee's person and the area from within which he might gain possession of a weapon or destructible evidence . . . ." *People* v. *Blasich*, supra, 73 N.Y.2d 678. Accordingly, under New York law, that exception arguably would not apply in the present case, where the defendant was arrested and his car was impounded before the search, even though the automobile exception does apply under *Belton*. Id. (under *Belton*, when occupant of automobile has been arrested and there is probable cause to believe that automobile contains evidence of crime of arrest, "a warrantless search of the vehicle is authorized, not as a search incident to arrest, but rather as a search falling within the automobile exception to the warrant requirement"). *Gant* makes clear, however, that the search found valid by the New York Court of Appeals in *Belton* would be permissible as a search incident to arrest under the federal constitution.

that the automobile contains [evidence] related to the crime for which the arrest is made, police may search, within a reasonable time after the arrest, any container, locked or otherwise, located in the automobile"), cert. denied, 465 U.S. 1028, 104 S. Ct. 1287, 79 L. Ed. 2d 690 (1984).[17]

---

[17] A number of courts have analogized cell phones to closed containers and concluded that a search of their contents is, therefore, valid under the automobile exception or the exception for a search incident to arrest. See *United States* v. *Rocha,* United States District Court, Docket No. 06-40057-01-RDR (D. Kan. October 2, 2008) (automobile exception); *United States* v. *James,* United States District Court, Docket No. 1:06CR134 CDP, 2008 U.S. Dist. LEXIS 34864, *10–11 (E.D. Mo. April 29, 2008) (automobile exception); see also *United States* v. *Finley,* supra, 477 F.3d 259–60 (search incident to arrest); *United States* v. *McCray,* United States District Court, Docket No. CR408-231 (S.D. Ga. December 5, 2008) (search incident to arrest); but see *United States* v. *Park,* United States District Court, Docket No. CR 05-375 SI, 2007 WL 1521573, *8–9 (N.D. Cal. May 23, 2007) (because cell phones can contain large amount of information and search of contents is not necessary to preserve safety of police or to prevent destruction of evidence, cell phones are not analogous to physical containers or items such as wallets and diaries for purposes of search incident to arrest exception); *State* v. *Smith,* 124 Ohio St. 3d 163, 166–68, 920 N.E.2d 949 (2009) (same).

In *United States* v. *Murphy,* 552 F.3d 405, 411 (4th Cir.), cert. denied, 556 U.S. 1196, 129 S. Ct. 2016, 173 L. Ed. 2d 1109 (2009), the court expressly rejected the defendant's argument that he had a heightened expectation of privacy in his cell phone because it was capable of storing a large amount of information. The court stated that the defendant had "not provided the [c]ourt with any standard by which to determine what would constitute a 'large' storage capacity as opposed to a 'small' storage capacity, as he does not quantify these terms in any meaningful way. Second, [the defendant] has introduced no evidence that his cell phone had the requisite 'large' storage capacity which he contends is subject to a heightened expectation of privacy. Third, even assuming that his cell phone does have a 'large' storage capacity, his argument still fails because it is premised on the unwarranted assumption that information stored on a cell phone with a 'large' storage capacity would be any less volatile than the information stored on a cell phone with a 'small' storage capacity.

"Finally, [the defendant's] argument must be rejected because to require police officers to ascertain the storage capacity of a cell phone before conducting a search would simply be an unworkable and unreasonable rule. It is unlikely that police officers would have any way of knowing whether the text messages and other information stored on a cell phone will be preserved or be automatically deleted simply by looking at the cell phone. . . . Rather, it is very likely that in the time it takes for officers to ascertain

The defendant in the present case does not dispute
that, on the basis of the evidence that the Mamaroneck
police found in his apartment, they had probable cause
to arrest him for drug offenses. The trial court found
that the cell phone was visible on the front seat of
the defendant's car when he was arrested and that the
Mamaroneck police consider cell phones to constitute
drug paraphernalia and records because they are likely
to contain information about drug transactions.[18]
Because the police had probable cause to believe that
the defendant was selling drugs, because the defen-

a cell phone's particular storage capacity, the information stored therein
could be permanently lost." (Citation omitted.) Id., 411.

Moreover, we do not believe that the New York Court of Appeals would
be persuaded by the reasoning of the court in *Park* that a search of the
contents of a cell phone is not valid under the automobile exception because
the search is not necessary to preserve the safety of police officers or to
prevent the concealment or destruction of evidence, because the New York
court has held that a primary justification for the exception is the reduced
expectation of privacy in automobiles. See *People* v. *Blasich*, supra, 73
N.Y.2d 678 ("[t]wo considerations have generally been cited as justifying
the exemption of car searches from the warrant requirement in appropriate
circumstances: the reduced expectation of privacy associated with automo-
biles, and their inherent mobility which often makes it impracticable to
obtain a warrant"); compare id. (under New York constitution, search inci-
dent to arrest exception to warrant requirement "exists *only* to protect
against the danger that an arrestee may gain access to a weapon or may
be able to destroy or conceal critical evidence" [emphasis added]).

[18] Indeed, the trial court expressly found that "[t]he [cell] phone was seized
base[d] upon the experience of the police that it contained evidence of drug
activity." The defendant contends that this finding was clearly erroneous
because the Mamaroneck "police never obtained search warrants for cell
phones but automatically seized them in narcotics cases and searched them
in the hopes that it would help in their investigations." Even if we assume
that the police are required to specify cell phones when requesting authority
to seize records of drug activities, however, the fact that the Mamaroneck
police customarily did not ask for such authority does not mean that they
would not receive it if they asked for it based on their experience that cell
phones are likely to contain such records. Holland testified at the suppres-
sion hearing that the police customarily seized cell phones to determine
whether calls had been made to persons who were known to be drug users
or drug dealers. We conclude, therefore, that the trial court's finding was
supported by the record.

dant's cell phone was visible in the defendant's car when the police arrested him and because the police had probable cause to believe that the cell phone contained evidence of drug activity, we conclude that the police had probable cause to seize and search the contents of the cell phone under the automobile exception as applied in New York.

In addition, as we have indicated, the New York Court of Appeals has held that the automobile exception "is equally applicable whether the search is conducted at the time and place where the automobile was stopped or whether, instead, the vehicle is impounded and searched after removal to the police station . . . ." *People* v. *Blasich,* supra, 73 N.Y.2d 681; see also *Chambers* v. *Maroney,* 399 U.S. 42, 51–52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970) (fourth amendment permits warrantless automobile search supported by probable cause and conducted while automobile is impounded at police station). It is clear, therefore, that the seizure of the cell phone and search of its contents were not unconstitutional under New York law merely because the defendant's car had been impounded before the seizure and search. Accordingly, we conclude that the New York Court of Appeals would conclude that the seizure and search of the defendant's cell phone was valid under the automobile exception to the constitutional requirement for a warrant.

## II

The defendant next claims that the trial court improperly admitted evidence of uncharged misconduct. We disagree.

The following facts and procedural history are relevant to this claim. Before trial, the state filed a motion in limine seeking to introduce evidence that the defendant previously had engaged in misconduct that was similar to the charged conduct in this case. The defendant filed

a motion to exclude the evidence. At the suppression hearing, the state presented an offer of proof in the form of testimony by Gentile that the defendant had driven her to the same location in Norwalk where the victim had been murdered and had threatened her with harm. Specifically, Gentile testified that, in December, 2001,[19] after she had stolen money and cocaine from the defendant, the defendant told her that he wanted to go with her to the Bronx to obtain more drugs for his drug business. Gentile got into a car with the defendant and the defendant's cousin, Thomas, who was driving. Instead of driving south toward the Bronx, however, Thomas drove north toward Connecticut. At some point, the defendant pointed a gun at Gentile and placed handcuffs on her. After they entered Connecticut, Thomas stopped the car in an area where there were warehouses and a gate with two bars. The defendant then questioned Gentile about the theft of his money and his drugs. When Gentile refused to admit that she had stolen them, the defendant stated that he was going to get some gas and burn Gentile. He then got out of the car, left the area and returned with a can of gas. He then left again. Some time later, he called Thomas' cell phone, and Thomas told Gentile that the defendant was at her house with Gagliardi and Williams and he wanted Gentile to tell them to give him the money. Gentile did so. The defendant returned to the car a couple of hours later and they drove to Port Chester, where Gentile was released.

In April, 2005, Gentile told Weisgerber about the incident. Weisgerber brought Gentile to several locations in Norwalk to see if she could identify the location where the defendant had brought her. Gentile did not

---

[19] Gentile testified at the suppression hearing that these events occurred in December, 2002. She also testified, however, that they occurred before she met with Norwalk police in February, 2002. At trial, Gentile testified that the events occurred in December, 2001.

recognize the first three locations, but recognized the fourth one. Weisgerber then took Gentile around the corner from that location and told her that the police had found the victim there.

During argument on the state's motion in limine, the state argued that Gentile's testimony was relevant to the issue of identity because the defendant's treatment of Gentile was so similar to the perpetrator's treatment of the victim. The state agreed, however, that it would not elicit testimony about the defendant's threat to use gasoline to burn Gentile. The defendant argued that the evidence was highly prejudicial to the defendant in that it tended to show that the defendant had a propensity to engage in this type of conduct and that the incident with Gentile was not sufficiently similar to the murder to come within the exception to the bar on propensity evidence for signature crimes. The trial court concluded that the conduct was sufficiently similar to be probative on the issue of identity and that its probative value outweighed its prejudicial effect. Accordingly, it granted the state's motion to admit the evidence.

At trial, Gentile testified substantially in accordance with her offer of proof testimony at the suppression hearing, with the exception that she did not testify about the defendant's threat to burn her with gasoline. The trial court immediately cautioned the jury that the evidence was being introduced solely for the purpose of proving the identity of the perpetrator, not to show that the defendant was a person of bad character or had a propensity to commit crime. The court further instructed the jury that, if it determined that the uncharged misconduct was not similar to the charged conduct, it could not consider it for any purpose. The trial court repeated these instructions to the jury in its final jury charge.[20]

[20] The trial court charged the jury that "[t]he evidence offered by the state of prior acts of misconduct of the defendant is not being admitted to prove the bad character of the defendant or the defendant's tendency to commit

The defendant now claims that the trial court improperly admitted Gentile's testimony about the defendant's misconduct toward her because the conduct was not sufficiently similar to establish identity. We agree with the defendant that the trial court improperly admitted the evidence. We also conclude, however, that its admission was harmless.

Our standard of review for evidentiary claims is well settled. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." Id.

criminal acts. Such evidence is being admitted solely to show or establish the identity of the person who committed the crime which is the subject of this trial.

"You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find it logically, rationally, and conclusively supports the issue for which it is being offered by the state, but only as it may bear here on the issue of identity. You have [to] independently assess the similarities between the offense involving . . . Gentile and this offense.

"On the other hand, if you do not believe such evidence or even if you do, [if] the offenses are not similar in their circumstances, if you find that there's not logically, rationally, and conclusively support [for the] issue for which it is being offered by the state, namely, identity of the person who committed the matter, the homicide of [the victim] . . . [t]hen you may not consider that particular testimony of . . . Gentile for any purpose.

"You may not consider evidence of prior misconduct, except for the limited purpose of . . . attempting to prove identity, because it may predispose your mind uncritically to believe that the defendant [may be] guilty of the offense here charged, merely because of the alleged prior misconduct. So for this reason, you may consider the . . . Gentile evidence only on the issue, that particular portion of her testimony, only as it bears on . . . identity and for no other purpose."

Because the defendant challenges the trial court's interpretation of § 4-5 (b) of the Connecticut Code of Evidence,[21] our review is plenary.

"As a general rule, evidence of . . . other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him.[22] . . . The rationale [for] this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged. . . . The fact that such evidence tends to prove the commission of other crimes by an accused does not render it inadmissible [however] if it is otherwise relevant and material. . . . Such evidence is admissible for other purposes, such as to show intent, an element [of] the crime, identity, malice, motive or a system of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 161–62, 665 A.2d 63 (1995); see also Conn. Code Evid. § 4-5 (b).

"The first threshold for the use of evidence of other crimes or misconduct on the issue of identity is that the methods used be sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other. . . . McCormick points out that in proffering other crime evidence [t]o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused . . . much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature."

---

[21] Conn. Code Evid. § 4-5 (b) provides in relevant part: "Evidence of other crimes, wrongs or acts of a person is admissible . . . to prove . . . identity . . . ."

[22] See Conn. Code Evid. § 4-5 (a) ("[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character or criminal tendencies of that person").

(Citation omitted; internal quotation marks omitted.) *State* v. *Figueroa,* supra, 235 Conn. 163.

"[T]he fact that some of the similarities between the offenses were legal or relatively common occurrences when standing alone does not . . . negate the uniqueness of the offenses when viewed as a whole. It is the distinctive combination of actions which forms the signature or modus operandi of the crime . . . and it is this criminal logo which justifies the inference that the individual who committed the first offense also committed the second. . . . The process of construing an inference of [i]dentity . . . consists usually in adding together a number of circumstances, each of which by itself might be a feature of many objects, but all of which together make it more probable that they coexist in a single object only. Each additional circumstance reduces the chances of there being more than one object so associated." (Citations omitted; internal quotation marks omitted.) Id., 164.

In the present case, the state argues that the misconduct evidence was sufficiently similar to the murder to establish that the defendant was the perpetrator because both Gentile and the victim were customers of the defendant's drug business; the defendant was angry at both Gentile and the victim because he believed that they had stolen from him; the defendant used the same ruse to lure Gentile and the victim to accompany him; the defendant brought both Gentile and the victim to the same place; and Thomas had accompanied the defendant during both incidents.

As we have indicated, however, evidence of other misconduct is admissible *only* for the purpose of raising an inference that "the person who performed one misdeed also did the other." (Internal quotation marks omitted.) Id., 163. Thus, misconduct evidence is admissible *only* to show that the defendant, rather than

another person, committed the charged crime. Regardless of how similar the uncharged misconduct is to the charged conduct, the uncharged misconduct may not be used to prove that, because the defendant committed the same type of conduct before, he committed the charged conduct. See *State* v. *Vorhees*, 248 S.W.3d 585, 591 (Mo. 2008) ("[e]vidence of prior bad acts, regardless of the degree of their similarity to the acts in the charged case, may not be admitted to *corroborate*" evidence that defendant committed charged offense [emphasis in original]); id., 590 ("[s]ignature evidence used for corroboration is, at base, propensity evidence masquerading under the well-recognized identity exception, a category of exception in which it does not belong").[23]

In the present case, it is obvious that the jury could not have concluded that a person other than the defendant had been angry with the victim because of the theft of the defendant's bracelet and had tricked the victim into accompanying him on a drive on the night

[23] In Missouri, the admission of propensity evidence has been found to violate the defendant's state constitutional right to be tried for the offense for which he was indicted. *State* v. *Vorhees*, supra, 248 S.W.3d 587–88, 591. There is no constitutional prohibition on the admission of propensity evidence in Connecticut. As we have indicated, however, the admission of misconduct evidence to establish propensity is generally prohibited under § 4-5 (a) of the Connecticut Code of Evidence. Although our cases have not expressly discussed the rationale for this prohibition, the rule presumably embodies "a long-standing element of American law. It is part of our jurisprudential tradition that an accused may be convicted based only upon proof that he committed the crime with which he is charged—not based upon poor character or uncharged sins of the past. The rule against use of other misconduct evidence to suggest that the defendant had a propensity to commit crimes of the type charged recognizes that such evidence may have a too-powerful influence on the jurors, and may lead them to determine guilt based upon either a surmise that if the defendant did it before, he must have done it this time, or a belief that it matters little whether the defendant committed the charged crime because he deserves to be punished in any event for other transgressions." *State* v. *Wood*, 126 Idaho 241, 244–45, 880 P.2d 771 (App. 1994). Thus, the rationale for the rule barring propensity evidence is the same in Connecticut as it is in Missouri.

of the murder. Rather, if it disbelieved the evidence tending to prove those facts, it could have concluded only that the conduct did not occur. Thus, the state was not using the similarity between the defendant's prior conduct with Gentile and the defendant's conduct with the victim to show the defendant, and not another person, had engaged in that conduct toward the victim, but to corroborate the evidence that he had engaged in that conduct by showing that he previously had engaged in extremely similar misconduct. As we have indicated, the evidence was not admissible for that purpose. We conclude, therefore, that the trial court improperly admitted the evidence.

We must determine, therefore, whether the improper admission of the misconduct evidence was harmful. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the [impropriety] was harmful. . . . [A] nonconstitutional [impropriety] is harmless when an appellate court has a fair assurance that the [impropriety] did not substantially affect the verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 663, 969 A.2d 750 (2009).

We conclude that the admission of the misconduct evidence was harmless. First, Gentile's misconduct testimony did not cast the defendant in a significantly worse light than the other evidence presented at trial. Both Gagliardi and Gentile testified that the defendant ran a drug selling business. Moreover, contrary to the defendant's claim that the misconduct evidence was the only evidence tending to show that the defendant was a violent person, Gagliardi testified that she had discovered in December, 2001, that the defendant carried a gun. The defendant told her at that time that he needed the gun for protection. Gagliardi also testified that the defendant had told her that he had shot the victim multiple times.

Second, the jury had before it other strong evidence of the defendant's guilt. Again, Gagliardi testified that the defendant had confessed to her on the morning following the murder that he had killed the victim by shooting him multiple times and that he had asked her to provide him with an alibi. Gagliardi's testimony also showed that the defendant had a motive to kill the victim. In addition, the cell phone records provided strong evidence that the defendant had been in the area of Norwalk where the murder occurred at the time of the murder and corroborated the testimony that he had spoken by telephone to Gagliardi and Gentile shortly after the murder.

Third, the trial court forcefully instructed the jury that it could not use the evidence to infer that the defendant had a bad character or that he had a propensity to commit criminal acts both immediately after Gentile's misconduct testimony and during its final instructions. Under these circumstances, we have a fair assurance that the misconduct evidence did not substantially affect the verdict.

### III

We next address the defendant's claim that the trial court violated his fifth amendment right to remain silent when it admitted evidence that he had invoked that right during questioning by the police. He further claims that the state violated his fifth amendment right when it commented on that evidence during closing arguments. We disagree.

The following facts and procedural history are relevant to our resolution of this claim. On March 29, 2004, Weisgerber and Andrew Gail, a lieutenant with the Norwalk police department, interviewed the defendant regarding the victim's murder. Before trial, the defendant filed a motion to suppress the statements that the defendant made during this interview on the ground

that the defendant had made the statements without having been properly advised of his *Miranda* rights,[24] and that he had made them involuntarily. The defendant testified concerning the interview at the February 28, 2006 suppression hearing, and the state introduced the written police report of the interview. The trial court denied the motion to suppress on March 2, 2006.[25]

At trial, the prosecutor started to question Weisgerber about the interview and the police report and the defendant objected. The trial court excused the jury and noted that the statements that the defendant had made during the interview had been the subject of the defendant's motion to suppress, which the court had denied. The trial court acknowledged, however, that the defendant had reserved his right to object to the admission of the statements on grounds that he had not raised in the motion to suppress. Accordingly, it held a conference in chambers during which it heard the parties' arguments and ruled on the portions of the written police report about which Weisgerber would be permitted to testify.

After the conference in chambers, the parties returned to the courtroom and defense counsel placed on the record her objections to the court's rulings. With respect to the defendant's statement in the written police report that he was not ready to share his opinion about who had committed the murder, defense counsel objected to its admission on the ground that the defendant was entitled to invoke his right to remain silent. She also objected to the admission of the defendant's statement that Weisgerber had "asked a very good question" because it was intertwined with his statement that he was not going to discuss the crime scene, which

[24] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[25] The trial court later issued a written memorandum of decision explaining its decision. The defendant does not challenge this ruling on appeal.

the trial court had excluded as an invocation of the defendant's rights. Defense counsel further objected to the admission of the defendant's statements that he was not willing to divulge information because the police were not going to release him, claiming that the statements were invocations of his right to remain silent.

Thereafter, the prosecutor continued his examination of Weisgerber. Weisgerber testified that, at the beginning of the interview, he advised the defendant of his *Miranda* rights. The defendant waived those rights and Weisgerber asked him when he had learned about the victim's death and when he had last seen the victim. The defendant said that he could not recall. Weisgerber then asked the defendant whether he was willing to answer questions at that time or if he would prefer to answer them at another time. The defendant responded that there would be plenty of time to talk later. When Weisgerber responded that this would be his only opportunity to talk to the police, the defendant responded that there was no hurry to discuss details. After answering several more questions, the defendant stated that the police had arrested the wrong person. When Weisgerber asked why he had made that statement, the defendant responded that he did not want to answer the question at that time because he knew that the police would not release him that night.

Weisgerber further testified that the defendant initially had declined Weisgerber's request that he give a written statement about the night of the murder, but ultimately indicated that he would like to provide one. The defendant repeatedly denied in his written statement that he had hurt the victim. The defendant then asked Weisgerber whether he believed that the defendant had murdered the victim, and Weisgerber replied that he did. Weisgerber testified that the defendant's

demeanor did not change when Weisgerber made this statement.

Weisgerber further testified that, after the defendant answered several more questions, Weisgerber asked him whether he had ever been to Norwalk. The defendant responded that he had family in Connecticut, but that he would not speak about his family. Weisgerber testified that he then asked the defendant if he had gone to Norwalk with the victim and the defendant answered that he had not. Weisgerber again asked the defendant if he had gone to Norwalk with the victim on the night of the murder, and the defendant stated twice that "that was a very good question." Defense counsel then interrupted Weisgerber and asked for "one moment with counsel." The prosecutor then asked Weisgerber to continue his testimony and Weisgerber stated that the defendant had advised him that, "at that point he was not going to speak about the crime scene." The trial court asked defense counsel whether she objected to this testimony, and she indicated that she had no objection.

Weisgerber then testified that, shortly after stating that he was not going to talk about the crime scene, the defendant asked to go to the bathroom. Upon his return, he indicated that he knew the truth about the murder. When the prosecutor asked Weisgerber whether the defendant had been willing to tell the police what he knew at that point, Weisgerber responded that he had not. The prosecutor then asked why the defendant had been unwilling to talk to the police and Weisgerber stated that the defendant had said that he wanted to speak to counsel first. Defense counsel again interrupted and stated that the trial court had granted the defendant's motion to exclude that portion of the written report of the interview. After conferring with counsel, the trial court directed the jury to "completely disregard" Weisgerber's testimony that the defendant

was not going to tell the police what he knew about the murder without talking to an attorney first.

The next day, the defendant filed a motion for mistrial claiming that the state had violated the trial court's ruling excluding the defendant's statement that he would not tell the police what he knew about the murder until he talked to an attorney. She argued that the testimony suggested that the defendant had been "trying to hide something" by invoking his constitutional rights. The prosecutor conceded that Weisgerber inadvertently had violated the court's order, but argued that the defendant had not been prejudiced. The trial court concluded that the defendant had not been prejudiced by Weisgerber's brief reference to the defendant's request for counsel and denied the defendant's motion for a mistrial.

During closing arguments, the prosecutor referred to the statements made by the defendant during the March 29, 2004 interview. The prosecutor stated, "isn't it interesting that [the defendant] doesn't want to talk about where he was on the night [of the] murder nor what he did?"

The defendant now claims that the admission of Weisgerber's testimony about these matters violated his fifth amendment rights under *Doyle* v. *Ohio*, 426 U.S. 610, 611, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), which proscribed the use of post-*Miranda* silence or requests for an attorney against a defendant at trial. Specifically, the defendant claims that the trial court should not have permitted Weisgerber to testify that: (1) the defendant had told him that he was not yet ready to tell the police what he knew about the murder; (2) the defendant had initially refused to provide a written statement; and (3) the defendant's demeanor did not change when Weisgerber indicated that he believed that the defendant had killed the victim. In addition, the

defendant claims that the trial court improperly ruled that Weisgerber's testimony that the defendant had stated that he wanted to talk to an attorney before he spoke about the murder was inadvertent and was not prejudicial. Finally, the defendant claims that the prosecutor violated *Doyle* when he commented on the defendant's silence during closing arguments.

We first address the defendant's claim that the trial court improperly allowed Weisgerber to testify that the defendant had stated repeatedly that he did not want to tell the police what he knew about the murder. "In *Doyle* . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (Internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 764–65, 931 A.2d 198 (2007).

*Doyle* is not applicable, however, when the defendant has waived his right to remain silent. See *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985). "Once an arrestee has waived his right to remain silent, the *Doyle* rationale is not operative because the arrestee has not remained silent and an explanatory statement assuredly is no longer 'insolubly ambiguous.' By speaking, the defendant has chosen unambiguously not to assert his right to remain silent. He knows that anything he says

can and will be used against him and it is manifestly illogical to theorize that he might be choosing not to assert the right to remain silent as to part of his exculpatory story, while invoking that right as to other parts of his story. While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily follow that he may remain 'selectively' silent." Id.

In the present case, the defendant waived his *Miranda* rights and told the police that he could not recall how he had learned of the victim's death or when he had last seen the victim. He also stated that the police had arrested the wrong person and that he knew the truth about the murder. In addition, he gave a written statement in which he repeatedly denied that he had hurt the victim. Interspersed among these exculpatory statements, the defendant also made statements that he was not yet ready to tell the police everything that he knew about the murder and that he was not willing to discuss the crime scene.[26] He did not ask the police to end the interrogation, however, or indicate that he was reluctant to answer any inquiries until the point that he stated that he wanted to speak to an attorney, at which point the police ended the interview. Accordingly, we conclude that the defendant had not invoked his right to remain silent by stating that he was not yet ready to discuss everything that he knew about the murder and, therefore, Weisgerber's testimony about those statements did not violate *Doyle*.[27] See id., 296

[26] Defense counsel expressly stated that she did not object to Weisgerber's testimony that, after the defendant told Weisgerber that his question whether the defendant had been in Norwalk with the victim on the night of the murder was a very good one, the defendant stated that he was not going to discuss the crime scene. The defendant's objection to that testimony was, therefore, waived.

[27] The defendant cites several cases for the proposition that a defendant may reassert his right to remain silent after waiving it by refusing to respond to any more questions. He also cites several cases for the proposition that, when a defendant answers general questions by the police but refuses to discuss the crime, he has invoked his right to remain silent. Those cases

(when defendant refused to divulge certain information about crime to police, but "did not ask that the interrogation be ended or indicate reluctance to answer other inquiries" defendant failed to invoke fifth amendment right to remain silent).

We next address the defendant's claim that the admission of Weisgerber's testimony that the defendant initially declined to give a written statement violated *Doyle*. This claim was not preserved at trial and the defendant therefore seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[28] We conclude that the claim is reviewable under the first two prongs of *Golding*, but that the defendant cannot prevail under the third prong.

The following additional facts are relevant to our resolution of this claim. When the prosecutor asked Weisgerber whether the defendant had been willing to give a written statement, Weisgerber responded that the defendant had declined to do so. The prosecutor then asked, "A written statement?", thereby suggesting that he was surprised by Weisgerber's answer. When Weisgerber repeated his response, the prosecutor asked, "Did there come [any time] where [the defendant] decided he wanted to put something down in writing?" and Weisgerber answered affirmatively. It is

are inapposite in the present case because the defendant did not refuse to answer questions about the crime until he asked for an attorney, at which point the police ended the interview.

[28] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40.

clear, therefore, that the prosecutor had elicited Weisgerber's testimony that the defendant had initially declined to give a written statement in an attempt to explain the process by which the police had obtained the defendant's written statement, not to raise an inference that the defendant had been reluctant to cooperate with the police. "We have held that evidence of a defendant's silence that is . . . presented to show the investigative effort made by the police and the sequence of events as they unfolded, is not inadmissible under *Doyle* . . . ." *State* v. *Jones*, 215 Conn. 173, 186, 575 A.2d 216 (1990). We conclude, therefore, that this testimony did not violate the defendant's fifth amendment rights under *Doyle*.

We next address the defendant's claim that Weisgerber's testimony that the defendant's demeanor did not change when Weisgerber told him that he believed that he had murdered the victim violated *Doyle*. Because this claim was not preserved at trial, we review it under *Golding*. In support of this claim, the defendant relies on this court's decision in *State* v. *Plourde*, 208 Conn. 455, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989). In that case, the defendant raised two *Doyle* claims. First, he claimed that the trial court improperly had admitted evidence that he had failed to deny killing his wife. Id., 462–63. Second, he claimed that the trial court improperly had admitted evidence of his demeanor when the police confronted him with the evidence of his guilt. Id., 464–65. This court concluded that the record was inadequate for review of the first claim because it was not clear whether the defendant had invoked his right to remain silent at that point. Id., 463. We agreed with the defendant, however, that, because he clearly had invoked his right to remain silent before the police confronted him with evidence of his guilt, evidence of his demeanor at that time was inadmissible under *Doyle*. Id., 468. Thus,

we explicitly recognized in *Plourde* that *Doyle* does not require the exclusion of testimony regarding the defendant's postarrest conduct unless the defendant has invoked his right to remain silent.

In the present case, we have already concluded that the defendant did not invoke his constitutional right to remain silent until he asked for an attorney, at which point the interview was terminated. We conclude, therefore, that Weisgerber's testimony about the defendant's demeanor when Weisgerber said that he believed that the defendant was guilty was not inadmissible under *Plourde*.

We next consider whether Weisgerber's testimony that the defendant had refused to provide any more information about the murder to the police until he spoke with an attorney violated *Doyle*. As we have indicated, although the trial court had ruled that Weisgerber would not be permitted to give this testimony, it concluded that the testimony did not violate the defendant's constitutional rights because it was inadvertent, brief, isolated and had not prejudiced the defendant.

This court held in *State* v. *Hull*, 210 Conn. 481, 491, 556 A.2d 154 (1989), that "the constitution does not permit . . . extensive commentary on the defendant's invocation of his right to silence," including "the defendant's invocation of his right to counsel . . . ." We conclude, therefore, that in the present case, it was within the trial court's discretion to exclude testimony on the portion of the police report referring to the defendant's request for an attorney. We agree with the trial court, however, that, because Weisgerber's comment was inadvertent,[29] brief and isolated, and because

[29] During argument on the defendant's motion for a mistrial, the prosecutor explained to the trial court that he had had only about ten minutes to review the court's rulings on the police report with Weisgerber before he testified. When the prosecutor asked Weisgerber during his testimony why the defendant had not been willing to divulge what he knew about the murder, he expected that Weisgerber would testify that the defendant did not want to

the trial court immediately gave a curative instruction to the jury, the testimony did not prejudice the defendant. See id., 492 (testimony by three witnesses that defendant had invoked his right to counsel was harmless because testimony was not highlighted by prosecutor and evidence of defendant's guilt was overwhelming).

Finally, we address the defendant's claim that the prosecutor violated *Doyle* when he commented on the defendant's silence during closing arguments. We conclude that the prosecutor did not violate *Doyle* by stating "isn't it interesting that [the defendant] doesn't want to talk about where he was on the night [of the] murder nor what he did" because, as we have already concluded, the defendant had not invoked his constitutional right to remain silent before stating that he did not want to provide details about the night of the murder. Because the defendant chose to talk to the police, any statements that he made properly could be used against him. See *State* v. *Talton*, supra, 197 Conn. 295.

IV

Lastly, we address the defendant's claim that the trial court inadequately instructed the jury regarding the credibility of Gagliardi's testimony. Specifically, he claims that the trial court should have given the cautionary instruction for jailhouse informants, as required by *State* v. *Patterson*, 276 Conn. 452, 469, 886 A.2d 777 (2005). See also *State* v. *Arroyo*, 292 Conn. 558, 569, 973 A.2d 1254 (2009) (extending requirement for special credibility instruction to testimony of all jailhouse informants, regardless of whether benefit has been promised), cert. denied,    U.S.    , 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010). We disagree.

talk because the police were not going to release him that night, not that he wanted to speak with an attorney first.

The following additional facts are relevant to our resolution of this claim. Gagliardi testified at trial that, after she was arrested for drug offenses as the result of the search of the defendant's apartment, the Norwalk police interviewed her at the Mamaroneck police station. She gave two statements to the police that night. In the first statement, Gagliardi told police that the defendant had been angry because he believed that the victim had stolen his bracelet, that the defendant and the victim had left the defendant's apartment together on the night of the murder, that the victim never returned to the apartment and that Gagliardi previously had found a gun in the defendant's jacket. After a break, the police informed Gagliardi that the defendant was not taking responsibility for the drugs that had been seized from his apartment. Gagliardi testified that this upset her and, because she was upset, she gave a second statement indicating that the defendant had told her that he had shot the victim and that the defendant had asked her to provide an alibi. Gagliardi testified that she had received no benefit from the state in exchange for her testimony. She also testified that the drug charges against her had been reduced to misdemeanor charges, that she had served no time in jail[30] and that she was not testifying at trial because the charges had been reduced to a misdemeanor. She further testified that she was not on probation and that, if she had not testified at the defendant's trial, there would have been no danger that the New York authorities would attempt to imprison her on the drug charges.

The defendant submitted a request to charge requesting that the trial court give a special credibility instruction regarding Gagliardi's testimony.[31] As legal authority for the charge, the defendant stated: "The

[30] Gagliardi could not remember if she had pleaded guilty to the misdemeanor drug charges.

[31] The defendant submitted the following request to charge: "In this matter it can clearly be said that the credibility of . . . Gagliardi, state's informant, is a pivotal issue for you to consider.

charge is a compilation of the motive and accomplice charges approvingly cited in [D. Borden & L. Orland, 5 Connecticut Practice Series: Criminal Jury Instructions (4th Ed. 2007) § 3.10, pp. 192–93], and a number of Connecticut cases as follows: *State* v. *Cooper*, 182 Conn. 207, [210–12, 438 A.2d 418 (1980)]; *State* v. *Keiser*, 196 Conn. 122, [132–33, 491 A.2d 382 (1985)]."

The trial court specifically instructed the jury that Gagliardi was an informing witness and that the jury could consider whether she had motives for testifying other than truthfully.[32] It did not instruct the jury that

"An informer is one who claims to have heard another defendant make an admission about his case.

"In considering and weighing the testimony of an informer, you will test it by those rules of probability or improbability by which human conduct and the motives impelling or influencing people to do certain things are usually applied. You may consider his/her appearance and demeanor as a witness, the reasons she gave for telling the story to the state authorities, and among these tests, to consider whether any motive has appeared or any reason is apparent why she should seek to fasten so grave a crime upon the accused, if her story is untrue. The presence or absence of a motive is often an important factor to consider in a determination of the truth or falsity of a story. You may consider any promises that were made by a person in authority and the circumstances under which the informer's statement was made to any person in authority. You can also consider whether [her] complaint is retaliatory in nature and a response to her position that [the defendant] refused to exonerate her for illegally possessing narcotics.

"In other words, the testimony of an informer who provides evidence against a defendant must be reviewed with particular scrutiny and weighed by you with greater care than the testimony of an ordinary witness.

"Whether the informer's testimony has been affected by interest or prejudice against the defendant is exclusively for you to determine."

[32] The trial court instructed the jury that "[a]n informing witness is one who claims to have heard the defendant make an admission about his case. In this case you may consider whether . . . Gagliardi was an informing witness and whether she had any special interest in the matter.

"In considering and weighing the testimony of an informing witness, you will test it by those rules of probability and improbability by which human conduct in the motives impelling or influencing people to do certain things are usually applied. You may consider her appearance [and] demeanor as a witness, the reasons she gave for telling what she did to the state authorities, and among these tests to consider whether any motive has appeared for her to inform the authorities other than truthfully. It is for you to decide

Gagliardi's testimony must be viewed with "particular scrutiny and weighed . . . with greater care than the testimony of an ordinary witness," as requested by the defendant.

The defendant now claims that he was entitled to a special credibility instruction in accordance with *State* v. *Patterson*, supra, 276 Conn. 465, 469. We conclude that this claim was not preserved for review. The defendant stated in his request to charge that a charge regarding Gagliardi's testimony was required under our cases requiring a special credibility instruction for the testimony of accomplices and complaining witnesses. He did not explain to the trial court, however, why such a charge was required for Gagliardi's testimony when there was no suggestion in the case that she was implicated in the murder.[33] He also did not argue that the charge was required under *Patterson* or explain to the trial court why the holding of that case, which required a special credibility instruction only for *jailhouse* informants; see id.; see also *State* v. *Arroyo*, supra, 292 Conn. 569; should be expanded to apply to *all* witnesses who testify that the defendant confessed to them.[34] "As we

what credibility you will give . . . Gagliardi. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you."

[33] In *State* v. *Cooper*, supra, 182 Conn. 211–12, this court held that a defendant is entitled to a special credibility instruction for the testimony of a "complaining witness [who] could himself have been subject to prosecution depending only upon the veracity of his account of this particular criminal transaction . . . ." We emphasized that, for the instruction to be required, "there must be evidence . . . to support the defendant's assertion that the complaining witness was the culpable party." Id., 212. It is clear, therefore, that the complaining witness charge is required only when there is evidence that the witness committed the crime for which the defendant is being tried. Our research reveals no decisions by this court or the Appellate Court that have used the phrase "informing witness."

[34] Even on appeal, the defendant has cited no cases in which *Patterson* has been applied to the testimony of a witness who had not been incarcerated with the defendant. Rather, he contends that we should expand *Patterson* to apply to any witness who may have received a promise from the police or the prosecutor in exchange for his or her testimony. In *State* v. *Arroyo*,

have observed repeatedly, [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *Konigsberg* v. *Board of Aldermen*, 283 Conn. 553, 597 n.24, 930 A.2d 1 (2007). Moreover, the defendant is not entitled to review under *Golding* because he has made no claim that the trial court's failure to give a special credibility instruction violated his constitutional rights. Accordingly, we decline to review this claim.

The judgment is affirmed.

In this opinion the other justices concurred.

supra, 292 Conn. 569, however, we recognized that the credibility of jailhouse informants is particularly suspect because they "frequently have motives to testify falsely that may have nothing to do with the expectation of receiving benefits from the government."