******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MARASH GOJCAJ
(AC 35088)

DiPentima, C. J., and Lavine and Alvord, Js.

*Argued March 5—officially released June 24, 2014*

(Appeal from Superior Court, judicial district of
Danbury, Pavia, J.)

*Stephan E. Seeger*, with whom, on the brief, was *Igor
G. Kuperman*, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney,
with whom, on the brief, were *Stephen J. Sedensky*

*III,* state's attorney, and *Sharmese L. Hodge,* assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Marash Gojcaj, appeals from the judgment of conviction, rendered after a trial to a jury, of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that the trial court improperly (1) denied his motion to dismiss the charge for lack of territorial jurisdiction, (2) denied his motion to suppress certain security system records obtained by a warrantless search, (3) admitted these security system records into evidence under the business record exception to the hearsay rule, and (4) instructed the jury on consciousness of guilt. We affirm the judgment of the trial court.

The following facts, as the jury reasonably could have found, and procedural history are relevant to the resolution of this appeal. On the evening of April 4, 2004, the defendant and the victim, Zef Vulevic, enjoyed dinner and wine at the Inn at Newtown. The defendant was the victim's nephew, and they co-owned Gusto Ristorante (Gusto's), an Italian restaurant located in Danbury, where the victim served as head chef. They also lived in the same apartment in Danbury. After dining, the pair returned to Gusto's and continued drinking alcoholic beverages. Business was slow that evening, prompting the defendant to close Gusto's early, at approximately 11:30 p.m.

After closing, Daniel Cruz, a former employee of Gusto's, and his wife, walked by the restaurant en route to their apartment located across the street from Gusto's. The defendant and the victim chased after Cruz and exchanged words with him before Cruz entered his building. The defendant kicked in a portion of the apartment building's front door. In response, Cruz called the police.

The police arrived shortly after midnight and interviewed Cruz about the verbal altercation. While interviewing Cruz, the police observed the defendant and the victim outside Gusto's. The defendant and the victim were then questioned by the police. The officers observed that the defendant and the victim had been drinking, but that only the victim appeared intoxicated. The defendant offered to make restitution to the apartment building's owner for the damage to the door, and the police declined to arrest the defendant. Throughout the course of the interview, the victim repeatedly interrupted the police officers—he appeared agitated and aggressive. The officers instructed the defendant to take the victim off the street.

Twice, as the police attempted to leave the scene, the victim yelled at them, saying that he wanted to fight the officers. The police instructed the defendant to take control of the victim, and threatened to tase the victim if he did not get off the street. At the request of the police, the defendant physically restrained the victim

and took him inside Gusto's. The police heard the sound of breaking glass and yelling from inside the restaurant, but left the vicinity at 12:32 in the morning on April 5, 2004.

On evening of April 4, 2004, and into the early morning hours of April 5, 2004, Kenya Braden, a college student was working on a psychology paper in an apartment overlooking Gusto's front entrance. Braden observed the altercation between the defendant and Cruz and the police response. As she worked through the night, she periodically looked down upon Gusto's. Shortly after 2 a.m., on two occasions, she observed the victim crawling out of Gusto's on his hands and knees before the defendant grabbed the victim's shirt and dragged him back into the restaurant. According to Braden, "[the victim] looked like he was trying to get away."

At approximately 3:30 a.m., Braden observed the defendant park a white van in front of the restaurant. The defendant exited the vehicle, removed boxes from the back of the van, and took them inside Gusto's. At 4 a.m., Braden went to sleep.

According to telephone records, the defendant made telephone calls from Gusto's landline to a close friend at 3:34:14 a.m. and 3:34:51 a.m. Alarm records indicated that Gusto's security system was armed at 3:59 a.m. Using his cell phone, he telephoned another close friend at 4:10:09 a.m. and 4:10:30 a.m., and the victim's cell phone at 4:24:31 a.m. These three cell phone calls utilized a cell phone tower, indicating that the defendant was either at Gusto's or in the area of Interstate 84 in Danbury.

The defendant subsequently traveled to Bedford, New York. At approximately 8:10 a.m., sometime during the first week of April, 2004, Joy Ovadek, a witness who commuted through Bedford daily, observed a white van that resembled the defendant's parked on the side of Baldwin Road.

At 9:02 a.m. on April 5, 2004, Mark Nolan, the owner of Cruz' apartment building telephoned the defendant's cell phone and spoke to the defendant regarding the damaged door. That telephone call utilized a cell phone tower indicating that the defendant was west of Interstate 684 in Armonk, New York. The defendant made more calls from his cell phone that morning, indicating that he was in the vicinity of New Rochelle, New York, and moving north.

Later that morning, the defendant returned to Gusto's at 11 a.m. and unlocked the door for Timothy Ludlum, an employee. Ludlum observed that a statue had been broken and that there was broken glass on the floor. The defendant told him that the victim had been intoxicated and emotional the previous evening, and that he "flipped out" and "just left."

On April 6, 2004, the defendant telephoned Dennis

Radovic, a chef who had worked at Gusto's in February, 2004. The defendant told Radovic that the victim was missing and that he needed a chef. Radovic agreed to return to work at Gusto's, and upon entering the kitchen he noticed that a bone saw was missing. Radovic stated that the saw hung in the kitchen at Gusto's when he had worked there in February, 2004.

On April 8, 2004, at 9 a.m., the defendant telephoned Magic Carpet cleaning service and arranged for Gusto's carpets to be cleaned that morning. The carpet cleaning was completed before noon. That afternoon, the defendant filed a missing person report with the police, suggesting that the victim may have traveled to Florida to visit family.

The next day, April 9, 2004, the Danbury police requested that the defendant and the victim's brother, Nikola Valuj, come to police headquarters for questioning. The defendant told police that the last time he had seen the victim was between 1 a.m. and 2 a.m. on April 5, 2004, and that the victim was wearing a dark colored T-shirt and black and white chef's pants. The defendant acknowledged the incident with Cruz, and stated that the victim became emotional and broke a podium and a glass door in the restaurant that night before leaving the restaurant. In a subsequent interview with police on April 21, 2004, the defendant provided a written statement. He explained that the victim became emotional, stormed out of Gusto's around 1 a.m., and that "I figured he was venting and was walking to our apartment [in Danbury]. So, me and a worker, who stayed at the apartment during the week of work, went home. . . . I left around ten or fifteen minutes after [the victim did]. I went directly home and have not heard from him since." The defendant told police that "he was fairly certain that he left [Gusto's] around 1 a.m., but no later than 1:30 a.m." The defendant also stated that, after the victim left Gusto's, he called the victim and left him a voice mail message.[1]

On April 16, 2004, the defendant had Gusto's carpets replaced, stating to the installers that he wanted the job completed as quickly as possible. Prior to the arrival of the carpet installers, the defendant removed the carpeting himself and placed the remnants in a dumpster outside Gusto's. The police collected the carpeting, and upon reassembling it, discovered that one section was missing.

On Saturday, April 24, 2004, David Jussel, an Earth Day volunteer was cleaning up trash in Bedford, New York. Jussel stumbled upon a black trash bag enveloped in flies. The volunteer opened the bag, revealing a human foot covered in maggots. Jussel's mother then called the police.

Forensic testing later determined that the foot, and the rest of the body parts that were subsequently recov-

ered, belonged to the victim. An autopsy revealed two gunshots to the back of the victim's head. The medical examiner determined that the gunshots to the head were the cause of death and that the victim was dismembered postmortem.

In February, 2008, while incarcerated on an unrelated matter at Westchester County Correctional Facility, the defendant asked Anthony D'Amato, an inmate working as a librarian, if there was a statute of limitations for murder. D'Amato later dispatched a letter to the Connecticut prosecutors stating that the defendant "told me that he killed his uncle . . . shot him dead then cut him in pieces and that he was intoxicated at the time."

On the basis of the aforementioned evidence, the jury reasonably could have found that in the early morning hours on April 5, 2004, inside Gusto's, the defendant fired two bullets into the back of the victim's head—killing him instantly. The defendant cut the victim into seven pieces and deposited each piece—head, four limbs, and torso severed in half—into black trash bags before dumping the body parts in New York State.

The defendant was arrested on August 19, 2008, and charged with murder in violation of § 53a-54a. The defendant pleaded not guilty. Prior to trial, the defendant moved to dismiss the charge for lack of territorial jurisdiction. The court determined that because the motion to dismiss encompassed the state's entire evidence, the court would entertain the motion at the conclusion of the state's evidence. When the state rested, the court denied the defendant's motion to dismiss. On November 5, 2010, the jury found the defendant guilty of murder. The defendant was sentenced to fifty years in prison and this appeal followed.[2]

I

The defendant first claims that the court improperly denied his motion to dismiss the charge of murder for lack of territorial jurisdiction. Specifically, the defendant contends that the state failed to prove beyond a reasonable doubt that the victim was killed in Connecticut. Following the state's case-in-chief—and again at the close of evidence—the defendant moved to dismiss the charge of murder. The trial court denied the defendant's motion, finding that it had territorial jurisdiction to adjudicate the crime charged. We conclude that there was ample evidence to support the trial court's findings and its determination that it had territorial jurisdiction.

To adjudicate a charge of murder, it is well established that the state carries the burden of proving territorial jurisdiction. Consistent with the general rule that our courts will punish only offenses committed within the territory of our state, the state must prove that the killing charged in the information occurred within the territorial borders of Connecticut. See General Statutes § 51-1a (b); *State* v. *Volpe*, 113 Conn. 288, 294, 155 A.

223 (1931).

"In reviewing the sufficiency of the evidence to support [territorial jurisdiction] we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the [finding of territorial jurisdiction]. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [court] reasonably could have concluded that the cumulative force of the evidence established [that the murder occurred in Connecticut]." (Internal quotation marks omitted.) *State* v. *Na'im B.*, 288 Conn. 290, 295–96, 952 A.2d 755 (2008). On the basis of our review of the record, we conclude that there was sufficient evidence for the trial court to have found that the victim's murder took place in Connecticut beyond a reasonable doubt.[3]

The evidence at trial established that the defendant and the victim were business partners who operated a restaurant together in Danbury. On the evening of April 4, 2004, the defendant and the victim ate dinner together before returning to Gusto's; the victim was intoxicated. At approximately 2 a.m. on April 5, 2004, Braden witnessed the victim crawling out of Gusto's on his hands and knees, trying to "get away," before the defendant physically dragged him back into the restaurant. After this moment, the victim was never again seen alive. Later, at approximately 3:30 a.m., Braden saw the defendant park a white van in front of Gusto's and remove boxes from it. A similar white van was later observed at 8:10 a.m. by Ovadek, during the first week of April, 2004, parked in the area where the victim's body was later discovered.

Alarm system records and telephone records also supported the court's conclusion that the murder occurred in Connecticut. One record from Gusto's security system indicated that the alarm system was disarmed shortly after midnight on April 4, 2004, and armed at 3:59 a.m. on April 5, 2004. This evidence, and Braden's testimony that she observed the defendant park a van in front of Gusto's at 3:30 a.m., contradicts the defendant's statement to police that "he was certain he left [Gusto's] no later than 1:30 a.m." and stayed at his apartment the rest of the night. Moreover, the defendant's cell phone records indicate that at approximately 9 a.m. on April 5, 2004, prior to opening Gusto's at 11 a.m., the defendant was near the site in New York where the victim's body parts were later discovered.

In addition, forensic evidence supported the state's charge that the murder occurred in Connecticut. The victim's body parts were clothed in the same attire that the defendant reported that the victim wore on April 4-5, 2004, at Gusto's. Given the level of decomposition and maggot development, William Krinsky, a forensic entomologist, determined that the victim's body parts had been disposed of between April 5, 2004, and April

9, 2004. An autopsy revealed that the victim had undigested food and alcohol in his stomach, consistent with the victim's having consumed food three to four hours prior to death. The victim also had 0.28 grams percentage of alcohol in his blood. On the basis of his review of the autopsy report, Michael Baden, chief forensic pathologist for the New York State Police, testified that alcohol concentration in the victim's blood was more than three times the legal limit allowed for operating a motor vehicle in New York.[4] Baden concluded that the autopsy report, ambient air temperature for April, 2004, and level of decomposition and maggot development were consistent with the victim having been killed on April 5, 2004. We observe that this evidence coincides with the victim's last known meal at the Inn at Newtown and having been intoxicated.

Moreover, shortly after the victim's disappearance, the defendant had Gusto's carpets cleaned and eventually replaced. Although most of the carpet was recovered by police, there was a portion that was never found. There was also testimony from Radovic, a Gusto's employee, that a handheld bone saw was missing from the kitchen when he was rehired after April 5, 2004. Expert testimony revealed that the markings on the victim's bones was consistent with their having been cut by a handheld bone saw.

In this case, "it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes [territorial jurisdiction] in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Na'im B.*, supra, 288 Conn. 296.

On the basis of the collective weight of the evidence presented during trial, construing the evidence in the light most favorable to sustaining the trial court's finding; id., 295–96; we conclude that the trial court properly determined that the victim's murder occurred in Connecticut, and therefore, that the court had territorial jurisdiction to adjudicate the charge of murder.

II

The defendant next claims that the court improperly denied his motion to suppress evidence. Specifically, the defendant argues that his fourth amendment rights were violated when his security system service provider disclosed to the police a panel-log[5] indicating when his alarm system was armed or disarmed because he had a reasonable expectation of privacy in this information. We disagree.

At trial, the state elicited testimony from James Corbett, a partner of United Alarm Services (United). Corbett testified that United contracted with Gusto's to provide security alarm services and that on April 21,

2004, the police requested information pertaining to the burglar alarm at Gusto's. Corbett complied with the request, and gave police a two page document. Corbett obtained this information by remotely connecting to Gusto's security system panel and downloading data stored in the panel's memory. The first page of the document contained general subscriber information; the second page, the panel-log, showed alarm panel activity from March 30, 2004, until April 21, 2004. The information on the second page was computer generated and indicated the date and time the alarm system was either armed or disarmed.

The defendant objected to the panel-log's admission into evidence and orally moved to suppress the panel-log, arguing that it was obtained by the police in violation of his fourth amendment rights. The issue was briefed, and the court held a suppression hearing at which Corbett testified.

On the basis of Corbett's testimony, the court found the following facts. In January, 2003, a business partner of the defendant, David Morganelli,[6] executed a monitoring agreement with United on behalf of Gusto's. Morganelli listed the defendant as a contact person, but there is no evidence linking the defendant to the execution of the monitoring agreement. One page of the monitoring agreement, entitled "Subscriber Information Sheet," warned that "[t]his information may be provided to the Police or Fire Department upon request."

The court found that the alarm system was controlled by a central control panel (panel) that was connected to United's operation center over a telephone wire. Although the panel was owned by Gusto's and located within the restaurant, the panel was operated by software that was designed and owned by United. The software controlled the basic operation of the alarm system and automatically logged information in the panel's memory. United provided a single passcode for Gusto's security system. There was no evidence as to how many of Gusto's employees had access to the passcode and because the passcode was shared, there is no way to determine who armed or disarmed the system. Upon entry of the passcode, the panel records the date, time of day, and whether the system is being armed or disarmed. It is this data that formed the basis of the panel-log.

Although the panel did not transmit this information directly to United, United had the ability to access the panel's memory and operations remotely over the telephone connection. It was common for United to remotely connect into a panel to perform basic maintenance, including adjusting the panel's internal clock. The defendant did not have access to the information stored in the panel; the only means of accessing the data was through United's remote connection software and downloading the information onto United's com-

puters. There was no evidence that the defendant ever knew that this information was being recorded by the security system.

The court concluded, on the basis of its findings, that the defendant had failed to prove "either a subjective expectation of privacy in the [panel-log] or an objective expectation of privacy . . . that society is willing to recognize as reasonable, in light of the [monitoring agreement] itself," and "the fact that the information was willingly transferred to a third party . . . as part of the contract . . . ." The court denied the defendant's motion to suppress.

In reviewing a denial of a motion to suppress, our standard of review is well established. The trial court's factual findings will be upheld so long as they are not clearly erroneous, but where the defendant challenges the trial court's legal conclusions, our review is plenary and we must determine whether these legal conclusions are "legally and logically correct and whether they find support in [the trial court's] decision . . . ." (Internal quotation marks omitted.) *State* v. *Boyd*, 295 Conn. 707, 717, 992 A.2d 1071 (2010), cert. denied, U.S. , 131 S. Ct. 1474, 179 L. Ed. 2d 314 (2011).

"The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of privacy." (Internal quotation marks omitted.) *California* v. *Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986). "Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . In order to meet this rule of standing . . . a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises]; and (2) whether that expectation [is] one that society would consider reasonable. . . . The burden of proving the existence of a reasonable expectation of privacy rests on the defendant." (Citation omitted; internal quotation marks omitted.) *State* v. *Boyd*, supra, 295 Conn. 718.

In this case, the defendant has not established that he had a reasonable expectation of privacy in the panel-log because he did not know that the information contained in the panel-log even existed, and there was no evidence that he intended to keep this information private.

Although the panel-log information was not directly transmitted to United, it had the authority to remotely connect and download information from the security system without the defendant's permission, pursuant to the monitoring agreement.[7] This operational information is of the type that one reasonably would expect to be shared with a monitoring company, as it relates directly to the operation of the security system and the service United was under contract to provide. See

*United States* v. *Kennedy*, 81 F. Supp. 2d 1103, 1110 (D. Kan. 2000) (defendant's fourth amendment rights were not violated when service provider turned over subscriber information, as there is no expectation of privacy in information provided to third parties). As the trial court aptly noted, the sharing of information with a third party is a fundamental element of a security system.[8]

It is well established that "[a person] takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government . . . [and] that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for *a limited purpose and the confidence placed in the third party will not be betrayed.*" (Citation omitted; emphasis added.) *United States* v. *Miller*, 425 U.S. 435, 443, 96 S. Ct. 1619, 48 L. Ed. 2d 71 (1976).

The defendant agreed to reveal information to a third party and was warned that this information could be disclosed to the police. We acknowledge that technological advances and the erosion of privacy stemming from our society's increasing propensity to share information present new and challenging evidentiary issues. Given the facts of this case, however, the police acquisition of the panel-log did not violate the defendant's fourth amendment rights.

### III

The defendant next claims that the trial court improperly admitted the panel-log into evidence under the business record exception to the hearsay rule. Specifically, the defendant argues that the court abused its discretion because (1) the panel-log was not kept within the ordinary course of business and (2) the information contained in the panel-log was not transmitted by anyone with a business duty to transmit such information. The state, on the other hand, contends that the court properly admitted the panel-log as a business record. Because we conclude that the panel-log does not implicate the hearsay rule, the defendant's evidentiary claim fails.[9]

At trial, Corbett testified that United contracted with Gusto's to provide security monitoring services and that he was familiar with the operation of the particular security system at Gusto's. The state sought to introduce the panel-log under the business record exception to the hearsay rule. The defendant objected, specifying that the panel-log was not kept in the ordinary course of business. The court disagreed and overruled the objection.[10]

Generally, our standard of review pertaining to the review of the trial court's evidentiary rulings is abuse of discretion; *State* v. *Gonzalez*, 272 Conn. 515, 542, 864

A.2d 847 (2005); however, "[t]o the extent a trial court's admission of evidence is based on an interpretation of the [Connecticut] Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007).

It is hornbook law that, absent an exception, hearsay is inadmissible. Pursuant to Connecticut Code of Evidence § 8-1, hearsay is "a statement, other than one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted." Our code defines "declarant" as "a person who makes a statement" and a "statement" as "an oral or written assertion" or the "non-verbal conduct of a person, if it is intended by the person as an assertion." Conn. Code Evid. § 8-1.

We observe that many computerized records require consideration of the hearsay rule because the electronic record at issue is based on the statement of a human declarant. Computer printouts that contain stored human statements are hearsay when introduced for the truth of the matter asserted in those statements. See *United States* v. *Ruffin*, 575 F.2d 346, 356 (2d Cir. 1978). This is the case with electronic bank records or other documents that, while stored in an electronic format, are clearly based on the statement of a human being. See, e.g., *Silicon Valley Bank* v. *Miracle Faith World Outreach, Inc.*, 140 Conn. App. 827, 836, 60 A.3d 343, cert. denied, 308 Conn. 930, 64 A.3d 119 (2013). The out-of-court declarant in such a case would typically be the bank clerk, patron, or whoever supplied the information that was entered into a computer.

Not all computerized records, however, are hearsay. As in this case, records that are entirely self-generated by a computer do not trigger the hearsay rule because such records "are not the counterpart of a statement by a human declarant . . . ." 2 C. McCormick, Evidence (J. Strong ed., 4th Ed. 1992) § 294. Stated differently, the hearsay rule is inapplicable because the opposing party is not deprived of an opportunity to cross-examine an out-of-court declarant when one does not exist and there is no danger of a "bare untested assertion of a witness . . . ." 5 J. Wigmore, Evidence (Chadbourn Rev. 1974) § 1362, p. 3.

For instance, "[w]hen an electronically generated record is entirely the product of the functioning of a computerized system or process, such as the 'report' generated when a fax is sent showing the number to which the fax was sent and the time it was received, there is no 'person' involved in the creation of the record, and no 'assertion' being made. For that reason, the record is not a statement and cannot be hearsay." *Lorraine* v. *Markel American Ins. Co.*, 241 F.R.D. 534,

564 (D. Md. 2007); see also *United States* v. *Lamons*, 532 F.3d 1251, 1263–64 (11th Cir.) (raw phone billing data not hearsay because it was "stated" by the machine, not by a person), cert. denied, 555 U.S. 1009, 129 S. Ct. 524, 172 L. Ed. 2d 384 (2008).

In this case, the state introduced the panel-log into evidence. As Corbett testified, the panel was programmed to record automatically every time the alarm was either activated or deactivated. When the correct passcode was entered, the panel recorded the date, time, and whether the system was being armed or disarmed.[11] The panel-log merely was a printout of this information and did not contain the statement of a declarant.

We find persuasive the reasoning of one of our sister courts where it observed: "[T]he printout offered as evidence in this case [is different] from printouts of human statements fed into the computer. Since the computer was programmed to record its activities . . . the printout simply represents a self-generated record of its operations, much like a seismograph can produce a record of geophysical occurrences, a flight recorder can produce a record of physical conditions onboard an aircraft, and an electron microscope can produce a micrograph, which is a photograph of things too small to be viewed by the human eye.

"We [need not consider the] defendant's contention that the printout in this case was not properly qualified as a business record, since we find that such a foundation was not required. The printout of the results of the computer's internal operations is not hearsay evidence. It does not represent the output of statements placed into the computer by out of court declarants. Nor can we say that this printout itself is a 'statement' constituting hearsay evidence." (Footnote omitted.) *State* v. *Armstead*, 432 So. 2d 837, 840 (La. 1983); see also *Murray* v. *State*, 804 S.W.2d 279, 284–85 (Tex. App. 1991) (record of electronic keycard access to hotel room not statement of person and not hearsay) (petition for discretionary review refused, September 18, 1991).

Accordingly, we conclude that the court did not err when it overruled the defendant's objection to the panel-log as a business record because it was not hearsay as a matter of law.[12]

IV

Finally, the defendant claims that the trial court abused its discretion by giving the jury a consciousness of guilt instruction. We disagree.

The following additional facts are relevant to the resolution of this claim. The state requested that the court give the jury a consciousness of guilt instruction on the basis of evidence that the defendant (1) had lied to police officers as to his whereabouts the morning of April 5, 2004, (2) cleaned and replaced the carpeting at

Gusto's, and (3) telephoned a state's witness prior to trial and requested that the witness not say anything that would be damaging to him.[13] During the charging conference, the court stated that it would give a generic instruction with respect to consciousness of guilt.[14] The defendant did not object to the instruction as given.[15]

The defendant failed to object to the court's issuance of a consciousness of guilt instruction; accordingly, this claim is not properly before us and will not be considered. See *State* v. *Washington*, 28 Conn. App. 369, 372–73, 610 A.2d 1332 (consciousness of guilt instruction merely stating permissive inference not constitutional in nature and must be properly objected to at trial), cert. denied, 223 Conn. 926, 614 A.2d 829 (1992).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Cell phone records confirm that this call was made, but indicate that it was for a zero second duration, belying the defendant's statement that he left a voice mail message. According to the testimony of Anthony Iaquinto, a senior inspector with the United States Marshal Service familiar with cell phone protocols, a voice mail message cannot be recorded without registering a call duration greater than zero.

[2] The appeal was filed in the Supreme Court and then transferred to this court pursuant to Practice Book § 65-1.

[3] We need not address the state's contention that territorial jurisdiction must be proven only by a preponderance of the evidence, given our conclusion that territorial jurisdiction in this case has been proven by the more demanding "beyond a reasonable doubt" standard. In its brief, the state contends that this issue requires further elucidation: "Although in *State* v. *Ross*, 230 Conn. 183, 195–96, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995), our Supreme Court stated that the state was required to prove territorial jurisdiction beyond a reasonable doubt, not only is this statement dicta . . . [but the Supreme Court] misread *State* v. *Beverly*, 224 Conn. 372, 618 A.2d 1335 (1993). In *Beverly*, our Supreme Court did not rule that the state bore the burden of proving territorial jurisdiction beyond a reasonable doubt. Rather, the trial court had imposed that burden in denying the defendant's motion for [a] judgment of acquittal based on lack of territorial jurisdiction, on appeal the state argued that the applicable quantum of proof was a preponderance of the evidence, and the Supreme Court declined to address this issue, contending instead that '[b]ecause the trial court applied the higher standard in this case, it is not necessary that we reach this issue.' [Id.], 376 n.5."

[4] Baden acknowledged that postmortem decomposition and fermentation may have increased the concentration of alcohol in the victim's blood so that "in this instance, even though his blood alcohol level is 0.28, which is very high, it could be that he only had 0.18 . . . [which] is also very high . . . ."

[5] The security system recorded in its memory the date and time the alarm system was either armed or disarmed. The panel-log is merely a printout of this information.

[6] Later in 2003, Morganelli sold his interest in Gusto's to the defendant.

[7] We note that Gusto's did not subscribe for an additional service that would have transmitted the panel-log information directly to United. There is no indication that Gusto's particular service election was an attempt to keep panel-log information from United.

[8] Corbett testified that he frequently downloads panel-log information from other customers for a variety of reasons:

"[The Prosecutor]: . . . [W]hat would be some of the reasons that you would go in and get that information?

"[Corbett]: Oh, sometimes the owner asks, who was in the building . . . who closed the alarm up. Sometimes they have, something's missing, and the police want to know, so we, you know, for break-ins, sometimes they say—the owner will say, the alarm was never turned on; we go to verify it was turned on. Then they say they got broken into and it was our fault the alarm didn't work. I'd call up, get a log and say, oh, you never turned the

alarm on. And, so there's all tons of reasons to get a log. . . . [S]ometimes you have to set the clocks, you have to set the calendar because a lot of these panels have clocks and calendars back before when the government changed the daylight savings time, they jumped it up a couple—back a couple of weeks, vice versa. I had to go start changing clocks . . . ."

[9] Although both parties agreed that the panel-log was hearsay, we do not share this conclusion. It is well established that "[w]e may affirm a trial court's decision that reaches the right result, albeit for the wrong reason." *State* v. *Albert*, 50 Conn. App. 715, 728, 719 A.2d 1183 (1998), aff'd, 252 Conn. 795, 750 A.2d 1037 (2000).

[10] The trial court overruled the defendant's objection as to the admissibility of the alarm records as business records without specification.

[11] The panel-log was comprised of three columns that included a header labeled "Date," "Time," and "Event." One entry beneath the header read: "3-31-2004 01:50 Close: User 1." Corbett testified that "Open" meant the alarm was disarmed, and "Close" indicated that it was armed. The entries were logged utilizing a twenty-four hour clock.

[12] On appeal the defendant argues that the state failed to introduce evidence that the computer record was reliable. We note that even if the panel-log did not trigger the hearsay rule, with respect to computerized records in general, "the proponent also must establish that the basic elements of the computer system are reliable." *Federal Deposit Ins. Corp.* v. *Carabetta*, 55 Conn. App. 369, 376, 739 A.2d 301, cert. denied, 251 Conn. 927, 742 A.2d 362 (1999); *State* v. *Dunn*, 7 S.W.3d 427, 432 (Mo. App. 1999) ("[b]ecause records of this type [computer generated telephone records] are not the counterpart of a statement by a human declarant, which should ideally be tested by cross-examination of that declarant, they should not be treated as hearsay, but rather their admissibility should be determined on the basis of the reliability and accuracy of the process involved" [internal quotation marks omitted]). Because the defendant failed to object as to the record's reliability at trial, and raises this claim for the first time on appeal, it will not be considered. See *State* v. *Gonzalez*, 272 Conn. 515, 539, 864 A.2d 847 (2005) (grounds for challenging evidentiary ruling limited on appeal to those asserted at trial).

[13] The jury heard the testimony of state's witness Stephen Nanai who stated that the defendant had called him prior to trial to discuss whether Nanai had "embellished" a statement he made to police. Nanai had told police investigators that he had seen the defendant on a previous occasion fire a gun at two people. Nanai testified at trial that the defendant "wanted to make sure that if [he] got called to testify, [he] wouldn't say anything that was damaging to him."

[14] The court charged the jury as follows: "In a criminal trial, it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense may have been influenced by the criminal act; that is, the conduct or statements show a consciousness of guilt. Such an act, however, does not raise a presumption of guilt. If you find the evidence proved and also find that the act was influenced by the criminal act and not by any other reason, you may, but are not required to infer from this evidence that the defendant has acted from a guilty conscience. It is up to you as the judges of the fact[s] to decide whether the defendant's action, if proved, reflect[s] a consciousness of guilt and to consider such in your deliberations in conformity with these instructions."

[15] In his brief, the defendant claims that he objected to the court's decision to give the jury a consciousness of guilt instruction. On the basis of our review of the record, including the transcripts of the charging conference, we conclude that no such objection was made.