BEENE, Judge:
*972 ¶1 Don Jacob Havatone appeals from his convictions and sentences for two counts of aggravated driving under the influence of intoxicating liquor ("DUI"), one count of aggravated assault, one count of endangerment, and four counts of misdemeanor assault. Because a Nevada statute at the time allowed a blood sample to be taken from an unconscious DUI suspect, the good-faith exception to the exclusionary rule applied, and the superior court did not err by denying Havatone's motion to suppress. Accordingly, we affirm.
FACTS AND PROCEDURAL HISTORY[1]
¶2 In September 2012, Havatone's SUV swerved into oncoming traffic and collided with another vehicle near Kingman, Arizona. Havatone was taken to a hospital in Nevada for injuries sustained in the collision. A police officer in Nevada, without securing a warrant, obtained a sample of Havatone's blood drawn by the hospital's phlebotomist. A criminalist in Arizona tested Havatone's blood sample and it showed a blood alcohol concentration of 0.21.
¶3 The State charged Havatone with two counts of aggravated DUI, five counts of aggravated assault, and one count of endangerment. Before trial, Havatone moved to suppress the results of the warrantless blood draw.
¶4 At the suppression hearing, Officer Perea with the Arizona Department of Public Safety ("DPS") testified that he responded to the collision. He stated that the passengers riding with Havatone, as well as the driver of the other vehicle, were injured in the collision. He found Havatone lying behind his SUV with a head wound. Officer Perea smelled alcohol coming from Havatone, found alcohol containers in his vehicle, and Havatone admitted he was driving.
¶5 Based on his injuries, Havatone was taken by helicopter to a hospital in Nevada. Officer Perea contacted DPS dispatch and asked them to contact Nevada Highway Patrol ("NHP") to collect a blood sample. DPS dispatch contacted NHP, informed them that Havatone caused a collision in Arizona, the officer on scene suspected him of DUI, and requested Nevada law enforcement assist in the collection of a blood sample.
¶6 Officer Perea did not direct dispatch to explain how Nevada law enforcement should collect the blood sample or whether they needed a search warrant. Although Officer Perea testified at the suppression hearing that whether to obtain a search warrant was his "sole decision," he did not believe he needed to obtain a search warrant for an out-of-state blood draw and he never attempted to do so in prior cases.
¶7 NHP dispatch relayed Officer Perea's request to NHP Officer Reinmuth. Officer Reinmuth testified that he went to the hospital, obtained a sample of Havatone's blood from a phlebotomist, and completed a declaration form pursuant to NHP protocol. Havatone was unconscious at the time of the blood draw and the State stipulated that the blood sample was not collected for medical purposes. The officer sent Havatone's blood sample to Arizona DPS for testing. Both officers testified that they followed departmental policies and their law enforcement training regarding the taking of Havatone's blood.
¶8 After the suppression hearing, the superior court found that the officers were authorized under both Arizona and Nevada law to obtain a warrantless blood sample, and, *973 even if a warrant was required, the good-faith exception applied. The court denied Havatone's request to suppress the blood test results and the evidence was presented at trial. A jury found Havatone guilty as charged in four counts and guilty of lesser included offenses in the remaining counts. The court sentenced Havatone to a total of 17.5 years' imprisonment.
¶9 In his first appeal, Havatone argued the superior court erred in refusing to suppress the blood test results because both states' "implied consent" laws authorizing officers to conduct blood draws from unconscious DUI suspects violated his Fourth Amendment rights. See Ariz. Rev. Stat. ("A.R.S.") § 28-1321(C) (2011); Nev. Rev. Stat. ("N.R.S.") § 484C.160(1), (2) (2009). Citing Missouri v. McNeely , 569 U.S. 141, 133 S.Ct. 1552, 185 L.Ed.2d 696 (2013), Havatone argued that the officers lacked exigent circumstances to obtain a warrantless blood sample and the good-faith exception did not apply under Arizona law.[2]
¶10 The State argued McNeely was issued after the blood draw occurred in this case and the good-faith exception applied under both Arizona and Nevada law. This Court agreed, affirming the superior court's ruling. State v. Havatone , 1 CA-CR 14-0223, 2015 WL 6472357, at *8, ¶ 29 (Ariz. App. Oct. 27, 2015) (mem. decision). We added, "[r]egardless of whether we assess Arizona or Nevada law, statutes in both states explicitly authorized the particular police conduct at issue here." Id . at *5, ¶ 20 (citing State v. Mitchell , 234 Ariz. 410, 419, ¶ 31, 323 P.3d 69, 78 (App. 2014) ).
¶11 The Arizona Supreme Court granted review of the denial of the motion to suppress the blood test results. State v. Havatone , 241 Ariz. 506, 509, ¶¶ 9-10, 389 P.3d 1251, 1254 (2017). The Arizona Supreme Court held that the "unconscious clause" of Arizona's "implied consent" statute, as applied in this case, was unconstitutional and the good-faith exception did not apply under Arizona law. Id . at 508, ¶¶ 1-2, 389 P.3d at 1253 ; see A.R.S. § 28-1321(C). The Arizona Supreme Court vacated this Court's decision, reversed the ruling on the motion to suppress, and remanded the case to the superior court. Id . at 515, ¶ 37, 389 P.3d at 1260. On remand, the Arizona Supreme Court ordered
the trial court to determine, in the first instance, whether Arizona or Nevada law applies. If the court concludes that Nevada law applies, it should determine whether the good-faith exception applies. If the good-faith exception does not apply, the trial court must vacate the convictions and sentences, suppress the blood-draw evidence, and order a new trial.
Id . at 515, ¶ 36, 389 P.3d at 1260.
¶12 On remand, the superior court ordered the parties to submit supplemental briefs on "whether Arizona or Nevada law should apply to the seizure of the blood in this case and, if Nevada law applies, whether the good-faith exception applies." The court found that Nevada law applied to the seizure of the blood, Nevada case law authorized the officer's conduct at the time of the seizure, and the good-faith exception applied. The court added, "Although the blood could not have been lawfully obtained in Arizona under the same procedures in place in Nevada, the blood was lawfully seized in Nevada. Imposition of the exclusionary rule would not serve its stated purpose of deterring police misconduct if the evidence was precluded." Thus, the court affirmed its prior refusal to suppress the blood test results.
¶13 Havatone filed a timely appeal from the superior court's ruling upon remand and we have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).
DISCUSSION
¶14 Havatone contends the superior court erred in applying Nevada law to the warrantless blood sample obtained through a draw conducted in that state and, in turn, erred in finding that the good-faith exception applied under Nevada law. Although Havatone argues that the court should have applied Arizona law, he asserts the good-faith exception *974 does not apply under either Arizona or Nevada law.
¶15 We review a ruling on a motion to suppress for an abuse of discretion. State v. Valenzuela , 239 Ariz. 299, 302, ¶ 9, 371 P.3d 627, 630 (2016). We review the superior court's legal conclusions as to issues of constitutional law and "the applicability of the good-faith exception to the exclusionary rule" de novo . Havatone , 241 Ariz. at 509, ¶ 11, 389 P.3d at 1254 ; State v. Booker , 212 Ariz. 502, 504, ¶ 10, 135 P.3d 57, 59 (App. 2006). We may only consider evidence presented at the suppression hearing and view the facts in the light most favorable to upholding the court's ruling. State v. Butler , 232 Ariz. 84, 87, ¶ 8, 302 P.3d 609, 612 (2013).
I. Purpose of the Exclusionary Rule
¶16 To resolve the choice-of-law issue, we first look to the history of the exclusionary rule. Known as a judicially-created "deterrent remedy," the exclusionary rule was imposed as a consequence for illegal searches and seizures. Wolf v. Colorado , 338 U.S. 25, 31-32, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). In Weeks v. United States , 232 U.S. 383, 393, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the United States Supreme Court explained that "the protection of the 4th Amendment ... is of no value" if evidence obtained in an illegal search and seizure can be used in a federal prosecution. To provide no remedy "would be to affirm by judicial decision a manifest neglect, if not an open defiance, of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." Id . at 394, 34 S.Ct. 341. Thus, the Court in Weeks created the federal exclusionary rule, barring the use of evidence obtained in violation of the Fourth Amendment. Id . at 391-99, 34 S.Ct. 341 ; see also Silverthorne Lumber Co. v. United States , 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).
¶17 Later, in Mapp v. Ohio , 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the United States Supreme Court extended the exclusionary rule to violations of the Fourth Amendment by state actors through the Due Process Clause of the Fourteenth Amendment. The Court noted, "without that rule the freedom from state invasions of privacy would be so ephemeral and so neatly severed from its conceptual nexus with the freedom from all brutish means of coercing evidence as not to merit this Court's high regard as a freedom implicit in the concept of ordered liberty." Id . (internal quotations omitted). The Court made clear that, at its core, the purpose of the exclusionary rule is to encourage compliance with the United States Constitution and prevent convictions based on illegally obtained evidence. Id . at 657, 81 S.Ct. 1684 ; see also Davis v. United States , 564 U.S. 229, 236-37, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) ("The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations.").
¶18 Although the primary aim of the exclusionary rule is clearly deterrence, our courts have indicated that exclusion is also a "recognition that the judiciary ought not be involved in exploiting violations of the basic law." State v. Coats , 165 Ariz. 154, 157-58, 797 P.2d 693, 696-97 (App. 1990). The exclusionary rule also serves to promote "judicial integrity." Elkins v. United States , 364 U.S. 206, 222-24, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). Although "judicial integrity" alone would not merit exclusion of evidence, it still plays a role in determining whether exclusion is proper in a given case. United States v. Janis , 428 U.S. 433, 458 n.35, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976).
¶19 In concluding Arizona's exclusionary rule "is no broader than the federal rule" in State v. Bolt , 142 Ariz. 260, 269, 689 P.2d 519, 528 (1984), the Arizona Supreme Court held that the rule in Arizona must mirror the federal rule. Noting that the exclusionary rule may allow guilty individuals to avoid prosecution, the Arizona Supreme Court conceded that it would be "poor judicial policy for rules governing the suppression of evidence to differ depending upon whether the defendant is arrested by federal or state officers." Id . at 267-69, 689 P.2d at 526-28. In adopting an exclusionary rule uniform with the scope and purpose of the federal rule, our courts have consistently held that the primary aim of the rule is to deter officer misconduct. E.g., Valenzuela , 239 Ariz. at 308-09, ¶ 31, 371 P.3d at 636-37 ("the exclusionary *975 rule ... is a prudential doctrine invoked to deter future violations."); Mitchell , 234 Ariz. at 419, ¶ 31, 323 P.3d at 78 ("the exclusionary rule ... incentivizes law enforcement to err on the side of constitutional behavior."); Booker , 212 Ariz. at 504, ¶ 11, 135 P.3d at 59 ("when there is no cognitive nexus between the police misconduct and the crime for which the defendant is ultimately tried, the exclusionary rule's primary deterrent purpose is not served.").
II. Choice-of-Law and the Exclusionary Rule Analysis
¶20 Based on the history of the exclusionary rule, we turn to the issue of which state's law applies. Although choice-of-law inquiries in the criminal context are rare and no prior Arizona case has directly addressed the issue,[3] other jurisdictions have adopted methods for determining whether the forum law (location of prosecution) or the situs law (location of officer conduct) applies. See John Bernard Corr, Criminal Procedure and the Conflict of Laws , 73 Geo. L.J. 1217, 1220-26 (1985).
¶21 Some states have chosen to employ a civil choice-of-law approach, typically called the interest analysis, which focuses on the forum state's ties to the case in deciding which law to apply; this approach tends to favor application of forum law. See State v. Grissom , 251 Kan. 851, 840 P.2d 1142, 1185-86 (1992) ; People v. Benson , 88 A.D.2d 229, 454 N.Y.S.2d 155, 156-57 (1982) ; People v. Saiken , 49 Ill.2d 504, 275 N.E.2d 381, 385 (1971) ; Burge v. State , 443 S.W.2d 720, 723 (Tex. Crim. App. 1969).
¶22 Other states have elected to use another approach, typically called the exclusionary rule analysis, which focuses on the underlying principles of the exclusionary rule in deciding which law to apply; this approach tends to favor application of situs law. See State v. Boyd , 295 Conn. 707, 992 A.2d 1071, 1084-88 (2010) ; State v. Harvin , 345 S.C. 190, 547 S.E.2d 497, 499-500 (2001) ; Pooley v. State , 705 P.2d 1293, 1302-03 (Alaska Ct. App. 1985) ; State v. Lucas , 372 N.W.2d 731, 736-38 (Minn. 1985) ; People v. Blair , 25 Cal.3d 640, 159 Cal.Rptr. 818, 602 P.2d 738, 746-49 (1979).
¶23 While the exclusionary rule's focus on deterrence is meant to promote officers' "knowledge of controlling law," any forum-based analysis would require officers to learn the law of any "other potentially interested state[ ]." Corr, supra , at 1228-29. Moreover, any approach that favors application of forum law, even in cases where officers acted lawfully in the situs state, ignores the deterrent purpose of the exclusionary rule. See Pooley , 705 P.2d at 1302-03. Conversely, the exclusionary rule analysis focuses solely on the practical implications of exclusion in a given case. See Harvin , 547 S.E.2d at 499. Given the fact-driven nature of the exclusionary rule analysis and the problems that arise under the interest analysis, "the trend appears to be toward using the exclusionary rule analysis." Tom Quigley, Do Silver Platters Have a Place in State-Federal Relations? Using Illegally Obtained Evidence in Criminal Prosecutions , 20 Ariz. St. L.J. 285, 322 (1988).
¶24 In Boyd , Pooley , and Blair , the courts in Connecticut, Alaska, and California reasoned that, although the officers' conduct would have violated their state law, excluding evidence obtained lawfully in other states would not serve to deter future police misconduct. Boyd , 992 A.2d at 1084-86 ; Pooley , 705 P.2d at 1303 ; Blair , 159 Cal.Rptr. 818, 602 P.2d at 747-48.
¶25 In the absence of contrary authority in this state, we believe the exclusionary rule analysis is better suited to resolving choice-of-law issues in criminal cases. Using this approach, we must identify the underlying principles of Arizona's exclusionary rule and determine whether those principles will be served in the application of forum or situs law. See *976 Richard Tullis & Linda Ludlow, Admissibility of Evidence Seized in Another Jurisdiction: Choice of Law and the Exclusionary Rule , 10 U.S.F.L. Rev. 67, 91 (1975). Mirroring federal law, Arizona courts have consistently held that the primary purpose of the exclusionary rule is to deter future police misconduct. See State v. Weakland , 246 Ariz. 67, 69, ¶ 6, 434 P.3d 578, 580 (2019).
¶26 In this case, the blood draw occurred in Nevada and Officer Reinmuth used NHP protocol in collecting the sample. Officer Perea merely sent a request through DPS dispatch to Nevada dispatch, providing no direction about the procedure the Nevada officer should employ to collect Havatone's blood sample. Nothing in the record shows that Officer Reinmuth acted as an agent of Arizona law enforcement or that Officer Perea intended to bypass a more protective state law. See Boyd , 992 A.2d at 1084-86 (finding no agency relationship where officers were merely present during an out-of-state search and record did not show they intended to skirt their state's law); State v. Brown , 132 Wash.2d 529, 940 P.2d 546, 589-90 (1997) (finding no agency relationship where officers "merely telephoned" another jurisdiction and asked them to question a suspect). Moreover, Officer Reinmuth's conduct was authorized by Nevada law at the time of the blood draw. Infra ¶¶ 30-32.
¶27 For these reasons, we adopt the reasoning in Boyd , Pooley , and Blair . Although the blood draw would have violated Arizona law, it was lawful under Nevada law and exclusion would not serve the purpose of our exclusionary rule.
¶28 Using the exclusionary rule analysis, we hold that the superior court did not err in applying Nevada law to the blood draw.
III. Application of the Good-Faith Exception
¶29 Next, we turn to whether the good-faith exception would apply to the blood sample obtained under Nevada law. As with other exceptions to the exclusionary rule, the good-faith exception arose out of the belief that suppression is "a massive remedy," unwarranted where it would yield no significant "deterrence benefits." Hudson v. Michigan , 547 U.S. 586, 596, 599, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). In establishing the exception, the United States Supreme Court in United States v. Leon , 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), held that "the marginal or nonexistent benefits" of excluding evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." Thus, in considering whether the good-faith exception applies, courts must consider whether exclusion has the potential to "meaningfully deter ... deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Herring v. United States , 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).
¶30 At the time of the collision in this case, the Nevada "implied consent" statute permitted officers to obtain nonconsensual blood draws from unconscious DUI suspects. N.R.S. § 484C.160(1), (2). In Galvan v. State , 98 Nev. 550, 655 P.2d 155 (1982), decided before McNeely , the Nevada Supreme Court considered this portion of Nevada's "implied consent" statute. In Galvan , the defendant caused a collision, appeared nonresponsive at the scene, and was transported to the hospital. Id . at 155. Suspecting him of DUI, officers obtained a warrantless blood draw while the defendant was unconscious. Id . at 155-56. Looking to the United States Supreme Court decision in Schmerber v. California , 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Nevada Supreme Court recognized that blood draws trigger Fourth Amendment protections. Galvan, 655 P.2d at 157. The Nevada Supreme Court, however, noted that nothing in the Schmerber decision required that officers obtain consent, make an arrest, or secure a warrant in every case. Id . The Schmerber decision merely required that a "properly performed" blood draw be "justified by the circumstances." Id . Based on those requirements, the Nevada Supreme Court concluded that the "inevitable and rapid" dissipation of alcohol in the defendant's blood was a sufficient exigent circumstance to justify a warrantless blood draw. Id .
¶31 Guided by McNeely , the Nevada Supreme Court ruled in 2014 that because dissipation *977 of marijuana in the blood alone did not create a per se exigency, the portion of Nevada's "implied consent" law that allowed officers to use reasonable force in obtaining a warrantless blood draw was unconstitutional. Byars v. State , 130 Nev. 848, 336 P.3d 939, 944-46 (2014). In that case, however, the court held that the officer reasonably relied on federal appellate precedent and Nevada law at the time of the blood draw and exclusion "would not act as a deterrent to unconstitutional police conduct." Id . at 946-47 (citing Davis , 564 U.S. at 244-46, 131 S.Ct. 2419 ).
¶32 Contrary to Havatone's argument regarding Officer Reinmuth's knowledge of his state's case law, we need only look to the objective circumstances of the seizure. See Leon , 468 U.S. at 922-23, 104 S.Ct. 3405 (holding the good-faith inquiry is an objective standard). Based on Nevada's "implied consent" law and its precedent at the time of the blood draw, Officer Reinmuth reasonably relied on his department's policy for obtaining a blood sample when procuring Havatone's blood. Moreover, exclusion of the evidence would not serve to deter officer misconduct where none can be found. As noted by the superior court, the officer not only followed Nevada precedent at the time of the seizure, but his department has since changed its policies regarding warrant requirements for blood draws. Officer Reinmuth's department policy has evolved to comply with post- McNeely standards, the record shows no "recurring or systemic negligence" on the part of NHP, and exclusion would carry no deterrence benefits. See Herring , 555 U.S. at 144, 129 S.Ct. 695. Under Nevada law, the good-faith exception would apply to the blood draw and suppression would not be warranted.
CONCLUSION
¶33 For the foregoing reasons, we affirm Havatone's convictions and sentences.

We view the facts in the light most favorable to sustaining the verdicts. State v. Payne , 233 Ariz. 484, 509, ¶ 93, 314 P.3d 1239, 1264 (2013).

Havatone added that, although he believed Arizona law controlled, the good-faith exception would not apply even under Nevada law.

Although the parties cite to Arizona case law involving out-of-state officer conduct, our courts have declined to adopt a specific choice-of-law analysis. See State v. Davolt , 207 Ariz. 191, 201-05, ¶¶ 21-34, 84 P.3d 456, 466-67 (2004) (applying Arizona and federal law to a search conducted in California); State v. Anderson , 197 Ariz. 314, 326, ¶ 34, 4 P.3d 369, 381 (2000) (declining to apply Arizona initial appearance rule to time spent in custody in Illinois).